350 So.2d 247 (1977)
Theophile O. MOSS, Jr., Plaintiff-Appellant,
v.
SECURITY NATIONAL INSURANCE CO. and Karl A. Fortier, Jr., Defendants-Appellees.
No. 6123.
Court of Appeal of Louisiana, Third Circuit.
September 2, 1977.
Rehearing Denied October 11, 1977.
Writ Refused November 23, 1977.
*248 Roy & Forrest by Leon E. Roy, Jr., New Iberia, for plaintiff-appellant.
Landry, Watkins, Cousin & Bonin by Wm. O. Bonin, New Iberia, for defendants-appellees.
Before CULPEPPER, GUIDRY and FORET, JJ.
FORET, Judge.
Plaintiff filed suit against Karl A. Fortier and his insurer, Security National Insurance Company, alleging that he suffered severe cervical, lumbar and anterior chest pains as a result of an automobile accident. All parties stipulated as to the negligence of defendant Fortier and the lack of contributory negligence of plaintiff Moss. Trial was held before a jury, and the only issue to be resolved was that of the extent of damages, if any. From the judgment of the jury which returned a verdict of "No Amount", plaintiff-appellant, Moss appeals.[1]
On May 18, 1974, in the early morning between the hours of 1:30 o'clock and 2:30 o'clock A. M., near the community of Broussard, Louisiana, a vehicle operated by plaintiff, Theophile O. Moss, Jr., occupied also by his wife Sandra, and proceeding in an easterly direction in the right outside lane of U. S. Highway No. 90, a four-lane thoroughfare, was rear-ended by the 1973 Dodge automobile owned and driven by defendant, *249 Karl A. Fortier, Jr. The Moss vehicle, which was inoperable after the collision, was shoved sixty-five (65') to seventy-five (75') feet from the point of impact and rolled into a gulley on the right-hand side of the roadway.
In order to fully appreciate the damages allegedlumbar, and chest and cervical pain, in that orderand the evidence presented as to their extent, we shall separately discuss them.

I.

LUMBAR PAIN
On the same day of the accident, and but a few hours later, Moss was examined and treated by Dr. Joseph A. Musso, who was accepted by the trial court as a specialist in the field of family medicine. Moss complained to the doctor of pain in his low back. The physical examination consisted of tests which were conducted to determine the range of motion in Moss' back. He was required to lay on his back and raise his legs. Although plaintiff complained of soreness in his low back, his range of motion was not restricted. X-rays of plaintiff's lumbar spine were taken, and they revealed a slight dextroscolosis (curve to the left) and the straightening of the lumbar lordosis (abnormal forward curvature). No other physical infirmity was seen. The clinical part of the examination consisted of those x-rays. From his clinical and physical examination, Dr. Musso concluded that Moss "had a muscle strain in his low back. . ." For a complete recovery therefrom, Dr. Musso recommended that Moss lay off his brick laying job for a period between four (4) to six (6) weeks and get plenty of rest.
Dr. Musso examined plaintiff two (2) more times. On June 3, 1974, plaintiff did not complain of back pain. The examination of his back revealed that he had a normal range of motion. He was told to miss work for at least four (4) more weeks. On Monday, June 17, 1974, plaintiff made no complaints about his back, and even told Dr. Musso that he had returned to work on June 14. Conducting no physical and clinical examinations, Dr. Musso discharged him from his care.
If, after June 17, Moss suffered low back pain, Dr. Musso believed that the recurrence would have been the result of a new incident, and not the automobile collision.
On July 26, 1974, plaintiff was examined and treated by Dr. Homer Kirgis, a neurosurgeon at Oschner Foundation Clinic in New Orleans, Louisiana. To this expert, plaintiff presented the following history: He was injured on May 18, 1974, in an automobile accident in which the vehicle which he operated was thrown forward about seventy-five (75') feet into a ditch. On the day of the accident, he suffered no physical problems. On the following day, his entire body was sore, and he visited a local physician, Dr. Musso. His greatest discomfort was situated in his lower back. No fracture was revealed by the x-rays taken of that part of his anatomy. Dr. Musso concluded that he sustained a severe strain or sprain of his lower back. Since there was recurrence of pain in his lower back, plaintiff continued to consult Dr. Kirgis. (Although Dr. Kirgis had a note in his records that the symptoms Moss manifested were not present prior to the accident, he did not know whether the note meant that the symptoms never existed or that they did not exist immediately prior to the accident.)
Dr. Kirgis' treatment of plaintiff Moss consisted of an examination of the stance, gait, movements of the extremities, strength, coordination, reflexes and movements of the back. The tests revealed a slight restriction of the lower back, which was secondary to the discomfort suffered and the slight degree of spasm in the lumbar paraspinous muscles. The findings suggested that Moss had sustained a strain or sprain of his lower back. We quote from Dr. Kirgis' testimony:
"The spasms of the muscles of these areas with the history presented by Mr. Moss suggested that he might have sustained a straining injury of the muscles or a straining injury of the ligaments in these *250 regions of the spine." (Tr., pg. 56. Emphasis added.)
At that time Dr. Kirgis was of the opinion that plaintiff Moss was slowly recovering. He advised his patient to apply heat to the pain area, to take mild analgesics as he needed them, to avoid physical activities that might unduly aggravate the pain, and to undertake those activities which he thought his body could endure and tolerate.
Moss reported to Dr. Kirgis' office on November 22, 1974. At that time, Moss stated that the pain in his lower back had continued, but at a lesser degree; that, although he had worked, he had been unable to perform his work at the same degree of efficiency; and that during the past few weeks, he experienced more discomfort than previously.
The examination conducted by Dr. Kirgis revealed the same symptoms as found on July 26. Accordingly, Dr. Kirgis advised the plaintiff to continue to apply heat, to avoid activities, and to take mild analgesics, and he believed that the plaintiff would recover if he followed that advice.
Dr. Kirgis examined plaintiff on January 15, 1975, at which time he was not working and was still experiencing pain in his lower back. On February 21, 1975, Dr. Kirgis recommended further diagnostic procedures, especially that a myelogram, or spinal puncture, be performed.
On March 2, 1975, plaintiff Moss, complaining of pain in his lower back, was admitted to Oschner Foundation Hospital. The next day, he underwent a spinal myelogram. Two (2) days later, on March 5, a bilateral laminectomy was performed. On March 10, the day of discharge, plaintiff Moss was transferred to an area of the hospital for physiotherapy.
The lumbar myelogram revealed a herniation of the fourth lumbar disc, which ruptured disc irritated the fifth lumbar nerve. Plaintiff Moss, suffering from pain in his back, knees and ankles, was advised to continue to rest, to sleep on a hard bed, to take hot baths, to exercise to tolerance (sitting up, back bending, walking, and isometric exercises), and to apply an electric heating pad to the areas of pain.
A month later, on April 15, 1975, plaintiff Moss visited Dr. Kirgis, who noted that the incision was well healed, and that there was a spasm of muscles in the patient's lower back, and who advised continued use of mild analgesics and heat application, and a gradual increase of the patient's physical activity.
At the doctor's office a month later, Moss again complained of pain in his lower back. He stated that although he had tried to do the prescribed exercises and that he had applied a heat pad to his back, he still experienced much discomfort. The examination at that time revealed restricted movement of the lower back. Dr. Kirgis was somewhat surprised, in that he had expected plaintiff Moss to have recovered a great deal more.
On July 18, 1975, Moss, with the same complaints, again was treated by Dr. Kirgis. He told the doctor that he had not yet gone back to work. The general neurological examination revealed a normal gait and stance, a slight to moderate restriction of movement of the lower back, and a residual tightness of the muscles of the lower back, of plaintiff. At that time, the doctor opined that plaintiff Moss could engage in light work.
"It was my impression that he would have a permanent degree of disability, between fifteen to ten percent, as a result of the rupture . . . Fifteen to twenty percent as a result of the rupture of the lower lumbar . . ." (Tr., pg. 103)
On August 26, 1975, for the last time, Dr. Kirgis treated plaintiff Moss. Moss stated that he suffered pain in his lower back, that he had supervised masonry jobs for a few hours a day, and that he slept on a hard bed and took aspirin to relieve pain. The clinical examination revealed normal findings other than a slight decrease in the range of movement of the back and a slight decrease in the activity of the left anklature.
Dr. Kirgis stated that it was quite usual for one suffering injury to a vertebral disc *251 to continue to experience pain. In plaintiff's case, as he was a bricklayer, it would have been rare had he not continually suffered. From his aforementioned treatments and examinations of plaintiff Moss, Dr. Kirgis opined that Moss' pain was not continuous, that Moss satisfactorily recovered, and that

"If the history is accurate that he wasn't having any difficulty like this prior to the accident, but did so immediately after the accident, then it would seem reasonable to conclude that the accident had caused this discomfort." (Tr., pg. 118. Emphasis added.)
When questioned regarding the recurrence of pain in one suffering from a ruptured disc, Dr. Kirgis stated that it was not unusual for a disc problem to become worse, thereby causing great pain; to temporarily remit; and then to flare up again. Had plaintiff suffered from similar pains prior to the accident, Dr. Kirgis thought the accident could have been the precipitating cause of the renewal of the back pain.
". . . I wish to point out that the injuries of this type that he sustained don't very often cause a real rupture of a normal lumbar disc. It causes great injury to the cervical disc, but not to the lumbar disc. So, if he had trouble with his back before, it's more reasonable that he had this much trouble after the accident." (Tr., pg. 121. Emphasis added.)
Dr. Steven Goldware, neurosurgeon, examined plaintiff Moss three times. On December 8, 1975, for the first time, plaintiff complained of low back pain. Patient Moss gave a history of the accident and subsequent medical treatment, and a history of muscular aches and pains through the years which did not prevent him from working.
The physical examination of the plaintiff illustrated a normal gait and walk, lumbar curves in the spine, tight muscles in the back and buttock, and nerve root irritation or injury in the hip, and ham-string tightness. The inspection of the lumbar myelogram and of the x-rays of the back showed a ruptured disc at the L-4-5 level.
Cognizant of all of the previous medical treatment received by Moss, and of Moss' occupation, Dr. Goldware stated:
"The lumbar disc has been removed between L-4 and 5. If this was done on both sides, that would account for five percent impairment of the whole man for each side. (Tr., pg. 485)
". . . Specifically, I do not know whether he can be a full-time bricklayer or not. On the basis of my minimal experience in that area, I would doubt that he would be able to do a full-time bricklayer's job. And that's based on just the idea of the amount of stooping and bending and lifting that he would have might have to do." (Tr., pg. 498)
In fact, plaintiff Moss had had similar low back pain complaints prior to the accident. On October 12, 1960, he was treated by Dr. Orien Dalton for sacroiliac pain complaints. The physical examination conducted at that time revealed tenderness over the sacroiliac area and pain upon pressure at the joint, and Butazolidin and two injections of muscle relaxants were prescribed.
On November 30, 1960, Dr. William Meuleman, an orthopedist, examined plaintiff, who complained of pain in the lower back. Although no x-rays were taken, all physical tests indicated that there were no objective medical bases for the complaints. Relief, not in the form of medical prescriptions, but rather in the form of corrective shoes, was "prescribed".
Dr. Meuleman agreed with Dr. Kirgis that one suffering from a ruptured disc usually passes through stages at which there is much pain, little pain, or no pain; that a disc problem is usually preceded by a long period of back pain, and that a ruptured disc does not usually result from a singular event. However, Dr. Meuleman stated that it would be very difficult, if not impossible, for a doctor who had not treated the patient for quite some time to determine, with any degree of accuracy, the cause of the patient's ruptured disc.
Numerous times in July and August, 1973, plaintiff Moss consulted Dr. Connie Peavy, a chiropractor, relative to the pain *252 in his back. To this doctor, answering a medical questionnaire in order to furnish a medical history, plaintiff wrote that he suffered from frequent cramps in his legs, that his weak ankles made his life miserable, and that the pain in his back made it difficult for him to maintain his job.

II.

CERVICAL & ANTERIOR CHEST PAIN
On his first visit to Dr. Musso, Moss complained of severe pain in his neck and right anterior chest. Dr. Musso found that plaintiff "had some pain on motion of his neck, but there was no . . . limitation of motion at the time". (Tr., pg. 892) X-rays of the cervical spine revealed that there was some straightening of the spine and that the neck was slightly tilted to the right. Those of the chest revealed no fractures or abnormalities, and there was no external evidence of bruises and contusions on the chest.
From the findings of his physical and clinical examinations, Dr. Musso concluded that Moss
"Had a muscle strain in . . . his neck and an area of contusion of his right chest, even though there was no external evidence to substantiate that he had hit his chest." (Tr., pg. 895)
He prescribed the discontinuation from work for four (4) to six (6) weeks and rest as cures for the complaints.
On the two subsequent occasions that plaintiff visited Dr. Musso, he made no complaints of pain. On the June 3d visit, he easily performed the neck exercises that he was requested to do. The examinations revealed the normal range of neck motion. He was advised to absent himself from his job for at least four (4) more weeks. On the June 17th visit Moss seemed relaxed and fully recuperated. Since plaintiff made no complaints of pain, neither a physical nor a clinical examination was conducted, and he was discharged.
On July 26, 1974, the first examination of plaintiff Moss by Dr. Kirgis, Moss stated that he suffered from an aching sensation in the back of his neck. The physical examination conducted by the doctor involved Moss' moving of his neck in various positions and revealed a slight restriction thereof. A slight spasm of the cervical paraspinous muscles was thought to be one of the causes therefor. Dr. Kirgis concluded that plaintiff had suffered either a strain or sprain of the muscles and ligaments of the cervical area of his intervertebral spine.
On the next examination (November 22, 1974), plaintiff Moss stated that he had continued to experience discomfort in his neck and the physical tests revealed that. At that time, Dr. Kirgis was somewhat startled, in that he had opined that Moss would have almost completely recovered, and advised plaintiff to apply heat to his neck and to avoid strenuous activities.
As the same neck complaints were made on the January 15, 1975 visit, a cervical collar was prescribed. At the February 21, 1975 meeting between the doctor and patient, the doctor opined that further diagnostic proceedings were required inasmuch as plaintiff Moss had worn the cervical collar until that time, had followed the doctor's advice, and still complained of neck pain.
On only two (2) subsequent visits did the physical and/or clinical examinations reveal objective findings of neck injury. The March 3rd cervical myelogram and the tests conducted on April 15, 1975, and August 26, 1976, were normal. Those conducted on May 15 and July 18, 1975, revealed restriction of movement in the neck. Dr. Kirgis opined that as a result of the cervical injury, Moss would have a ten (10%) per cent permanent degree of disability.
On January 6, 1975, Dr. Steven Goldware, neurosurgeon, conducted an examination of Moss, who complained of a sense of weakness in the neck and a tendency of his head to slump forward. The neurological testa medical review of the gait, stance, walk, and neck of plaintiffled the doctor to believe that there was a great likelihood of no injury to plaintiff's neck.

*253 "I'm not sure whether Mr. Moss really has anything in his neck or not. He may have an ulnar compression. That is constriction over the nerve of the elbow, the ulnar nerve." (Tr., pg. 478)
On his last two (2) visits to Dr. Goldware, Moss complained of neck pain. The examinations done at those times did not lead the doctor to objective findings of neck pain. On the latter visit (December 8, 1975), Moss could easily toe and heel walk and twist his neck. His spine possessed normal cervical curve. The doctor opined that plaintiff had satisfactorily recovered from his possible neck injury.
When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review, the appellate court should not disturb this factual finding in the absence of manifest error. Canter v. Koehring, 283 So.2d 716, 724 (La.1973). Accordingly, we must give great weight to the factual conclusions of the trier of fact, and reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review. However, in the case at bar, a careful review of the record convinces us that the verdict of the jury was manifestly erroneous, and the judgment rendered as a result of the said verdict should be reversed. We conclude that there was no reasonable factual or legal basis upon which a jury verdict of "No Amount" could be rendered. See Robinson v. General Motors Corporation, 328 So.2d 751 (La.App. 4 Cir., 1976).
We are thoroughly convinced that Moss sustained, in the accident of May 18, 1974, injuries to the cervical and lumbar regions of his spine. We further conclude that any pre-existing low back disease, if any, which Moss may have had must certainly have been aggravated by the accident. It is noted that after the accident, his low back condition deteriorated to such an extent that on March 5, 1975, a bilateral laminectomy was necessary; this, only nine and one-half months after the accident.
In reversing the trial jury, and making an assessment of damages where the trial jury awarded no damages, we must look for guidance to Coco v. Winston Industries, Inc., 341 So.2d 332 (La.,1976), and Schexnayder v. Carpenter, 346 So.2d 196 (La.,1977). Both of these cases dealt with a reduction of trial jury awards by this Court, and subsequent reversals by the Supreme Court to increase the damages. In the Coco case the Supreme Court wholly reinstated the trial jury award. In Schexnayder the Supreme Court acquiesced with us in reducing the jury award, but disagreed as to our award and increased same to what the Supreme Court thought, in its judgment, the award should be. In accordance with Coco and Schexnayder, we should award the lowest amount which the jury reasonably could have awarded.[2]
We are of the opinion that the trier of fact, even under the evidence least favorable to plaintiff, could reasonably have awarded to him no less than the amount of $15,000.00 for general damages, i. e., pain and suffering, mental anguish, etc., plus $3,098.50 for medical expenses. We further conclude that the trier of fact was not manifestly erroneous in refusing to award loss of earnings to plaintiff. Prior to the accident, plaintiff and his father were in partnership engaged in a brick laying business. Subsequent to the accident, plaintiff and his father incorporated their business. Plaintiff received funds from the corporation, although the bookkeeper for the corporation stated that such funds were only paid for work done. We conclude that the jury did not abuse its discretion in not allowing damages for loss of earnings, inasmuch as a reasonable evidentiary basis existed for its decision on that point. Canter v. Koehring, supra.
*254 In accordance with the above, we reverse the trial court judgment and award the plaintiff the amount of $18,098.50, plus legal interest thereon from date of judicial demand until paid.
All costs of this appeal are assessed against defendants-appellees.
REVERSED AND RENDERED.

ON APPLICATION FOR REHEARING
PER CURIAM.
Plaintiff, Theophile O. Moss, Jr., has applied for a rehearing, contending that we erred in our original opinion by not also assessing the costs in the trial court against defendants. Our failure to do so was an oversight, and accordingly we amend our original judgment, to assess all costs, both in the trial court and on appeal, against the defendants.
NOTES
[1] No motion for a new trial was filed by Moss.
[2] Cocopage 335:

"Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court."