KLIEBERT, Judge.
On May 26, 1978, JoAnne Avilez (hereinafter “Avilez”), plaintiff-appellee, struck her hand through a glass door at her home and was admitted to South Jefferson General Hospital (hereinafter “South Jefferson”), for surgery and skin graft to her hand. After the operation, Avilez was returned to her hospital room for the usual post-operative treatment. At approximately 6:00 o’clock A.M. the following morning, plaintiff awoke and went to the bathroom. While enroute to the bathroom, Avilez began to feel sick and lightheaded. She pulled the emergency light button for assistance but no one came. Plaintiff then lost consciousness and fell forward to the floor. Avilez sued South Jefferson General Hospital seeking damages for injuries to her mouth, neck, arms, back, hips and legs, as well as for mental pain and suffering and disfiguration. After trial on the merits, Avilez was awarded damages of $14,-623.08. South Jefferson appeals.
On appeal, South Jefferson argues three main specifications of error: 1) Plaintiff had not fulfilled her burden of proof by showing that the hospital was guilty of negligence which caused her injuries; 2) plaintiff was guilty of contributory negligence; 3) the damages awarded were excessive.
Dr. Edward Sudderth, Administrator of South Jefferson Hospital, was called to testify under cross-examination. He testified to South Jefferson being a small, 75 room hospital which is shaped like an “X”, with the nurses’ station located in the middle of the “X”. He stated that Avilez was in room 102, which is the second room down the hallway from the nurses’ station. Sud-derth explained the bathroom situation whereby one bathroom services two rooms. Further, the bathroom has an emergency system whereby a white light over the door to the room flashes simultaneously with a white and red light at the nurses’ station. Further, a beeping sound begins and continues until someone at the nurses’ station responds. However, the only way to turn these lights off is to go down the hallway and turn them off in the bathroom.
JoAnne Avilez testified as follows: After her surgery, she was placed in Room 102— Bed A and was told by the nurse that she was not to get up from bed too soon after surgery. At 3:00 P.M. on May 26, she called for help to go to the bathroom, but no one came. She called again at 5:00 P.M., but no one came; instead, her mother had to assist here. (In a prior deposition, plaintiff had stated that she made it to the bathroom unassisted at 5:00 P.M., but at trial, she explained the inconsistency by stating that her mother had reminded her, subsequent to the deposition, that her mother had assisted her to the bathroom at 5:00 P.M.)
A nurse came in at approximately 8:00 P.M., looking for a specimen and told plain *1262 tiff that someone would be there about 5:30 A.M. to get another specimen. She received a shot for pain at approximately 9:00 P.M., and then the nurse raised the railing on the left side of the bed but failed to do so on the right side.
The next morning no one arrived for the specimen. At approximately 6:00 A.M., Avilez got up and went to the bathroom. Avilez only had a throbbing headache when she got up, but as she approached the bathroom, she started feeling lightheaded and dizzy. As she opened the door she started feeling clammy and sweaty all about her whole body, and when she got to the bathroom, she rang the “call” light, grabbed onto the hand rail and sink, and eased herself down to the toilet. She then took a urine specimen and took care of her menstrual needs. At that time, things began to get grayish looking, and as she was holding onto the sink moaning for help, she heard someone asking “Are you all right? May I help you?” She then fainted and fell, face first.
When Avilez came to, she was unclothed (the surgical gown had fallen off) and she crawled back to her bed. However, prior to leaving the bathroom the door on the other side of the bathroom opened and a woman with dark hair and a long pink robe “did something and closed the door immediately.”
Avilez related that Annie Jacks, who was dressed in blue, was the first person she remembered seeing' after she returned to bed, and then two women in white came in. Jacks told her that the nurses were arguing over who would answer the call light and that there had been complaints all night about the nurses responding to calls. Avi-lez stated that the emergency light was on the entire time she was in the bathroom. She estimated that from the time she got in the bathroom, rang the light and took care of her personal needs, approximately three minutes had elapsed, and that from ringing the bell until she got back into bed was approximately four to five minutes.
Adele Valliant, the licensed practical nurse on duty at the time of the accident, testified that she was at the nurses’ station when Avilez signalled for assistance. Valli-ant twice pushed the intercom to Room 100 (sic) and asked what was wrong, but no one answered. Valliant then called to the nurses’ lounge for an aide, but received no answer, so she then got up and went to Room 100 herself. Before she went to look she told the registered nurse on duty to find an aide. Upon arriving at Room 100, she determined that both patients were sleeping. She then went back to see if she had the right room. Upon further investigation, she saw Avilez, naked, standing at the foot of the bed trying to get back into bed. As she assisted Avilez back into bed she noticed Annie Jacks, an aide, for the first time. She noticed that Avilez had broken her front teeth, but denied seeing any blood around her mouth. Valliant estimated that approximately a minute or a minute and one-half had elapsed between the first buzzer until the time she saw Mrs. Alivez standing in the room.
Mildred Raacke Kepler, the registered nurse and night supervisor at the time of the accident, testified that she and Valliant were at the nurses’ station and Annie Jacks, the aide, was in the nurses’ lounge at the time the emergency buzzer first sounded. Kepler related that Valliant had gone down the hall when the light came on and how she (Kepler) had called for the aide at the nurses’ lounge. Kepler stated that both Valliant and Jacks arrived before she did, but that Valliant had gone to investigate before Jacks had. Kepler estimated from the time she had first heard the buzzer until the time she arrived at room 102 approximately one and one-half to two minutes had elapsed.
Nell Jordon, plaintiff’s mother, testified that on the evening of May 26, she was present at 5:00 P.M. when Avilez had called for assistance to go to the bathroom but none came, and she had to assist Avilez herself.
Annie Jacks, the nurses’ aide, testified to having reacted immediately when she heard the emergency bell. She claimed to have arrived at the scene in less than one minute *1263 and that plaintiff was standing next to the wash basin with her gown on when she arrived. Jacks did not remember Valliant being there when she arrived.
Hospitals and their employees have a duty to respond to a patient in need of emergency care, especially when the patient is signalling for assistance from the bathroom. Furthermore, where, as here, hospital personnel do not want the patient to go to the bathroom unassisted, said personnel have a duty to ensure that the chances of the patient attempting to do so are minimized and therefore they have a duty to take necessary protective measures (e.g., putting up both sides of the hospital bed) while leaving the patient unattended.
A trial judge’s finding of fact is not to be disturbed on appeal in the absence of manifest error. Canter v. Koehring Co., 283 So.2d 716 (La. 1973). Manifest error simply means “clearly wrong.” Arceneaux v. Domingue, 365 So.2d 1330 (La. 1979).
After reviewing the record, we find no manifest error in the trial court’s finding that hospital employees had breached their duty to plaintiff and that said breach of duty was the proximate cause of plaintiff’s injuries.
While there were contradictions between the testimonies of the various witnesses, the contradictions were resolved by the trial court in plaintiff’s favor. In reviewing a judgment based on factual conclusions, credibility findings supported by the record should not be disturbed on appeal unless found to be clearly erroneous. DiVincenti v. Desforges, 372 So.2d 606 (La.App. 4th Cir. 1979); Moss v. Security National Insurance Co., 350 So.2d 247 (La.App. 3rd Cir. 1977) writ denied, 352 So.2d 239; Calais v. Petroleum Helicopters, Inc., 330 So.2d 408 (La.App. 3rd Cir. 1976).
We find no merit to this specification of error.
Appellant next contends that plaintiff was guilty of contributory negligence which bars her recovery because she wilfully left her bed without a nurse’s assistance in spite of instructions not to do so and she failed to return to her bed immediately upon feeling ill.
He who claims contributory negligence must prove by a preponderance of the evidence that the injured party failed to act as a reasonable and prudent man and that his negligence was a contributing cause of the accident. Watson v. Illinois Central Gulf Railroad, 355 So.2d 1366 (La.App. 1st Cir. 1978).
Avilez admitted not seeking assistance prior to leaving her bed the morning of May 27 because when she had sought assistance on two different occasions the day before, no one responded or arrived to assist her. In so doing, it cannot be said that she acted unreasonably. Further, while it is not unreasonable to assume that some people would return to bed and lie down upon feeling ill, it cannot be said that Avilez was unreasonable in sitting down in the bathroom and calling for help from that position instead of returning to bed.
Therefore, South Jefferson has failed to prove by a preponderance of the evidence that Avilez failed to act as a reasonable and prudent person under the circumstances. Accordingly, this assignment of error lacks merit.
Appellant next contends that the damages awarded to plaintiff were excessive.
Avilez testified she was just going to stay in the hospital one night due to her hand surgery, but she remained for five days because of her fall. After her fall, Avilez started having problems with dizziness, feeling faint, and vomiting. She related having a great deal of pain in the front of her mouth, stiffness in her back and neck, numbness on the entire right side of her body, complete numbness in her right arm and dull numbness in her hip radiated down to her knees. She related being unable to eat solid foods or drink hot or cold liquids for weeks after the accident due to her broken teeth, and of being very conscious of her missing teeth when she returned to work (prior to having a bridge fitted). Avi-lez related that despite treatment by sever *1264 al doctors and a chiropractor, she still experiences stiffness in her neck, trouble when turning to the right, shoulder and arm pain, and pressure in the back of her head. She still sees the chiropractor every three to four weeks.
Dr. Amilcar Correa, a neurosurgeon, first saw plaintiff on June 9, 1978. His initial diagnostic impression was that plaintiff had a cervical and lumbar sprain. He prescribed a combination of pain medication, muscle relaxant and antidepressants, as well as two hot showers daily to alleviate muscle spasms. Dr. Correa next saw plaintiff on September 19, 1978, and she had the same symptoms as the previous visit, so he arranged for physical therapy. He next saw Avilez on May 22, 1979, and she had essentially the same complaints plus headaches in the back portion of her head and limited range of neck motion due to pain. He hospitalized plaintiff and performed a myelogram, which was normal. Although he reported the same findings and had the same diagnosis as he initially found, Dr. Correa pointed out that the X-rays which were taken in the hospital were different from those taken initially in that the cervical spine showed some straightening from the natural curvature. He stated such a condition “is generally secondary to muscle spasms pulling on the spine and therefore losing the normal curvature of the spine.” Dr. Correa prescribed physical therapy for the muscle spasms. In addition, Dr. Correa stated Avilez had biofeedback treatment while in the hospital (which allows the patient to measure the intensity of relaxation she can achieve) and also had a psychotic episode while in the hospital. While Dr. Correa opined that he would expect a greater trauma than Avilez's hospital fall to cause her the continuing muscle spasms, he stated that since there were no other intervening causes, then the fall of May, 1978 was, in his opinion, the cause of her neck and back condition.
Dr. William Chapel, Jr., a chiropractor, first saw plaintiff on June 19, 1979. His initial examination revealed decreased cervical range of motion in all planes (flexion, extension, right and left rotation, and left and right lateral bending), a great deal of muscle contraction in the neck area, and a posture which was tilted to the right. X-rays revealed a straightening of the cervical spine and the C-l to C-6 vertebra being tilted towards the right. His diagnosis on initial examination was chronic sublexation complex of the cervical spine. He recommend 120 days of extensive chiropractic treatment, which Avilez completed. Dr. Chapel saw plaintiff three times a week from June, 1979 through November, 1979, and in December, 1979, started seeing her once a week. He now sees Avilez on a “needs” basis. In essence, Dr. Chapel had found an irritation of the nerves (a “pinched nerve”) which caused the muscle spasms. He felt that plaintiff’s injury would definitely cause the symptoms that plaintiff was suffering and that her trauma was more likely the cause of her straightening spine than her sedentary job (plaintiff is a legal secretary).
Dr. L. Thomas Cashio, an orthopaedic surgeon, examined Avilez on Defendant’s request on March 4, 1980, almost two years after her fall. He found full range of motion of the neck and back, no muscle spasm of the neck or back, but some subjective tenderness over the lower vertebra. He found Avilez’s X-rays to be within normal limits and found no objective findings of either neck or back or nerve root irritation. In essence, he found no objective findings to substantiate Avilez’s present subjective complaints.
Dr. Philip T. Griffin, a specialist in clinical psychology, administered a personality inventory test to Avilez on request of Dr. Correa in June, 1979. After the test, it was Dr. Griffin’s impression that Avilez had some paranoid personality tendencies. Dr. Griffin refused to state that Avilez was paranoid, but stated instead that she has paranoid tendencies. He admitted plaintiff could not manufacture her symptoms.
Dr. Roger Anastasio, a psychiatrist, saw plaintiff on June 14, 1979. Since he only interviewed plaintiff once, he could not give her a definite diagnosis. However, he felt *1265 plaintiff had significant psychological difficulties which could be schizophrenic in character. Dr. Anastasio felt the anti-depressant drug, which plaintiff was taking could have made the psychotic symptoms that plaintiff was exhibiting while in the hospital, and that her condition was probably more neurotic than schizophrenic. Dr. Anastasio could not form an opinion as to whether Avilez’s physical condition was caused by her mental condition or if it was magnified by it.
Glenn Avilez, JoAnne’s husband, testified to his wife being in good spirits and in good physical condition the night before the fall. He related her mental health seemed to be in good condition prior to the fall and she had never made any complaints of neck or back pain prior to the fall.
The deposition of Jimmie J. Gaubert, D.D.S., was admitted into evidence in lieu of his testimony at trial. Dr. Gaubert first saw plaintiff on June 5, 1978. He noted three broken teeth (two front teeth and an eyetooth) and treated Avilez for pain. He extracted the left front tooth after a root canal was unsuccessful and he performed a root canal on the right front tooth on June 26, 1978. On July 10, 1978, he gave plaintiff four temporary caps in preparation for permanent caps. The permanent caps were fitted on July 25, 1978 and plaintiff was discharged.
The trial court judgment awarded plaintiff $14,623.08. In its reasons for judgment, the court itemized this amount as $8,000.00 in general damages and $6,623.08 in special damages.
Before a Court of Appeal can disturb an award made by a trial court the record must clearly reveal that the trier of fact abused its discretion in making its award. Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1976).
Given the foregoing, we cannot say that the trier of fact abused its discretion in awarding damages. Plaintiff has proven, by a preponderance of the evidence, that it was more probable than not her injuries were the direct and proximate result of her fall at the hospital.
Accordingly, this assignment of error lacks merit.
For the foregoing reasons, the judgment of the trial court is affirmed. All costs of appeal to be paid by appellant.

AFFIRMED.