533 So.2d 1375 (1988)
Darrell WALLS, Plaintiff-First Appellant,
v.
OLIN CORPORATION, INC., et al., Defendants-Appellees,
Aetna Casualty & Surety Co., Intervenor-Second Appellant.
No. 87-835.
Court of Appeal of Louisiana, Third Circuit.
November 9, 1988.
Writs Denied January 13, 1989.
*1376 Raleigh Newman, Lake Charles, for plaintiff-first appellant.
Jones, Tete, Nolen, Hanchey, Swift & Spears, William B. Swift, Lake Charles, for intervenor-second appellant.
Scofield, Bergstedt, Gerard, Mount & Veron, J., Michael Veron, Thomas Bergstedt, Lake Charles, for defendants-appellees.
Before FORET, DOUCET, and YELVERTON, JJ.
YELVERTON, Judge.
Phosgene gas was accidentally released from the chemical plant of Olin Corporation, Inc., near Lake Charles, Louisiana, on June 2, 1982. During the following year a number of lawsuits were filed against Olin, and others, seeking damages on account of this accident. Three of the suits, personal injury claims by Darrell Walls, Paul Diamond, and Jimmy Fontenot, were consolidated and heard by a jury in December 1986. At the trial, Olin stipulated that on the morning of June 2, 1982, an amount of phosgene gas was released into the atmosphere in the TDI Unit at its Lake Charles Plant, and that if in fact the plaintiffs in this case sustained damages as a result of the release, the Olin Corporation was responsible for those damages. After trial the jury was given separate verdict forms for each plaintiff, each form consisting of three interrogatories. The jury answered the first two interrogatories in each case identically. The jury found, in answer to interrogatory No. 1, that the three plaintiffs were exposed to phosgene gas as a result of the phosgene release of June 2, 1982, and in answer to interrogatory No. 2, the jury found that neither of the plaintiffs sustained actual damage as a proximate result of that exposure.
The three plaintiffs have appealed the judgment rendered on those verdicts. Aetna Casualty & Surety Co., the worker's compensation carrier of the unsuccessful litigants, also appealed its intervention claim for recovery of compensation benefits. For reasons which follow, we affirm the judgments in all three cases. Separate judgments are today being handed down in Diamond v. Olin Corporation, Inc., et al, 533 So.2d 1382 (La.App. 3rd Cir.1988), and Fontenot v. Olin Corporation, Inc., et al, 533 So.2d 1382 (La.App. 3rd Cir.1988).

THE ISSUES
Plaintiffs present ten specifications of error. The first is the jury's failure to make an award. The other nine have to do with allegedly erroneous trial court rulings during the trial. We will discuss these *1377 specifications in the order presented in appellants' briefs.

1.

The Verdict
The jury found that no plaintiff sustained any actual damage as a result of his exposure to phosgene. To examine these findings of fact under the clear error standard, we need to explain what happened, the plaintiffs' claims of injury, their evidence, and Olin's defenses.
Interstate Highway 10 runs east and west through Lake Charles. North of the highway and west of the Calcasieu River is an oil refinery. J.A. Jones Construction Company was doing a construction job at this refinery. The three plaintiffs in these cases were working for J.A. Jones on that construction job.
Across the highway, south, lies the chemical plant of Olin Corporation. In its TDI (toluene diisocyanate) Unit at that plant, Olin makes phosgene gas. This gas is toxic. About 600 pounds of it escaped at around 10 o'clock a.m. on June 2, 1982. The plaintiffs in these cases, Wall, Diamond, and Fontenot, claimed that the gas, upon its release into the atmosphere, formed a cloud, that the winds prevailing that morning blew the cloud over and upon them, and that they inhaled the gas in the cloud. They alleged that as a result of this exposure, they now suffer permanent physical damages.
Walls, then 26, testified that his immediate symptoms were nausea and shortness of breath. He contends hayfever resulted as a permanent effect.
Diamond, also 26, testified that his initial complaint was diarrhea, occurring within the first week. His later and most enduring complaint was a condition of recurring intense headaches which he blames on the phosgene.
Fontenot, 48, is unquestionably a sick man. At the time of trial, two years after the incident, he had emphysema, blocked arteries, and an aortic aneurysm. He claims that the emphysema was either caused or aggravated by the accident. His doctors testified that because of the emphysema, surgery for the blocked arteries and the aneurysm is too dangerous to attempt.
Within two days of the exposure all three plaintiffs were taken to hospital emergency facilities in Lake Charles where they were examined and x-rayed. All three were released to return to work. The records of the hospitals indicate that none of the three were found to have suffered any injury. All three continued to work for J.A. Jones Construction Company until the job shut down that September.
In the first weeks following the exposure each plaintiff went to see Dr. Jana Kaimal, a Lake Charles physician specializing in pulmonary medicine. Relying on the histories given to him by his patients that they were in good health and free of symptoms before the accident, Dr. Kaimal initially believed that the conditionsthe headaches, diarrhea, obstructive lung disease (emphysema), hayfever, nauseacould have been either caused or aggravated by the exposure. He retreated somewhat from this stance in his trial testimony.
Dr. Robert Norwood Jones testified for the defendants. A medical school instructor at Tulane University, Dr. Jones, like Dr. Kaimal, was accepted as an expert in the field of pulmonary medicine. He examined all three of these plaintiffs and concluded that none of them suffered any injury from the exposure. His opinion was based not only on his own examinations, x-rays and lung function tests, but also on a review of the emergency room reports of St. Patrick Hospital and Lake Charles Memorial Hospital, and the reports and tests of Dr. Kaimal, as well as the reports of all other doctors involved in the cases.
The trial judge instructed the jury in his charges that the testimony of the physician who examines and treats the injured party is entitled to greater weight than that of a physician examining the party at a later date. Dr. Kaimal was the treating physician and Dr. Jones examined each of the plaintiffs only once.
Much testimony was elicited as to what phosgene is, how it travels in the air, how much of it it takes to hurt people, and what *1378 it does to the human body. Experts testifying for the defendants as to the effects of phosgene on humans, in addition to Dr. Jones, were Eric G. Comstock, M.D., specializing in medical toxicology, and Michael Frosolono, Ph.D., a pulmonary biochemist. Of this same Frosolono, the Federal 5th Circuit said: "Short of intentionally exposing humans to phosgene, it would be difficult to learn anymore about the effects of phosgene than has Frosolono." Dawsey v. Olin Corp., 782 F.2d 1254, 1263 (5th Cir. 1986).
According to these experts the effects of phosgene is dose-related. Its principal effect on the body is to inflame the moist surfaces with which it comes into contact. When it is breathed in sufficient quantities it can cause acute bronchitis by inflaming the bronchial tubes. In even greater quantities it can cause pulmonary edema, and it can be lethal. It can be breathed into the lungs, but does not go beyond the lungs. It is not unusual for it to have a delayed reaction, but very unusual for the reaction to be delayed as long as 24 hours, and never longer than that. The ultimate diagnosis of injury caused by phosgene is simple, according to Dr. Jones, who put it this way:
"There's nothing magic about phosgene and injuring the lung. It's like heat causing a burn; if it occurs, you know it. There are signs of it. You can be exposed to heat without being burned and you can be exposed to phosgene without having it injure your lung."
Defendants' experts were convinced that the exposure to phosgene in this case could not possibly have caused emphysema, arterial blockage, aneurysm, headaches, or hay fever.
As pointed out earlier, all three of the plaintiffs were thoroughly examined in the emergency rooms of local hospitals, and their examinations occurred at a time following the exposure when the effects, if any, would have become manifest. None were found to have suffered any effects from the exposure. All experts on both sides agreed that if actual injury did not make its appearance within 24 hours after exposure, it would never appear. There is substantial evidence in the record that none of these plaintiffs suffered any symptoms within the first 24 hours that could be related to the exposure.
Diamond had no complaints at all in the emergency room. His headaches began several days later and continued thereafter, sometimes becoming so bad, he testified, that he would hold his head in his hands and scream. Wall said he never had hayfever before the accident, but that he has suffered from it since. The experts said phosgene causes neither headaches nor hayfever.
The credibility of the plaintiffs could well have influenced the jury's decision. For example, Fontenot, a cigarette smoker for many years, testified that he was in good health on June 2, 1982, that he had never had a breathing problem, and that his symptom of shortness of breath began immediately with the exposure and has troubled him ever since. Fontenot was diagnosed conclusively by every doctor who saw him as having emphysema. At the trial he denied ever having seen a doctor or being in a hospital before June 2, 1982. He persisted in this denial even after being confronted with proof that he had gone to the emergency room of Lake Charles Memorial Hospital in 1980 complaining that he had been gassed on the job and that he could not breathe. It was only after a patient but persistent cross-examination that he remembered, and he then admitted that he had suffered shortness of breath in 1980 on the job after being gassed, and that he had gone to the hospital where x-rays were taken, emphysema was diagnosed, and he was told that he had emphysema. During the next few minutes of his testimony he twice volunteered that he had forgotten to tell his lawyer about that incident.
Dr. Daniel A. Herpin, a radiologist of Lake Charles, testified that he was the doctor who had examined a chest film of Fontenot taken in the emergency room of Lake Charles Memorial Hospital on January 8, 1980. Dr. Herpin testified that in 1984, two years after the accident in the present case and four years after his x-rays in 1980, he took new x-rays and compared them, and found no integral change in the *1379 emphysemic condition of the lungs. He stated that there was no evidence of pulmonary edema on any x-ray he ever saw of Fontenot.
The defendants did not rely entirely on their defense that the plaintiffs did not prove any actual injury as a result of the exposure. As a second line of defense, the defendants took the position, relying on experts, that the plaintiffs could not have been injured because the dose was not strong enough.
Dr. Otha John Jacobus, who has a Ph.D. in chemistry, and Dr. Robert Edgar Coleman Weaver, a chemical engineer with expertise in air dispersion modeling, testified for plaintiffs. The purpose of this testimony was to show that given the conditions on that day and the amount of gas released, a quantity of gas in a cloud got from the place where it was released to the place where the plaintiffs were working.
Testifying for the defendants on this subject was Dr. Ralph Sklarew, a physicist. Using the same data, and assuming a "worst case" scenario, Dr. Sklarew calculated what he believed was the maximum exposure to which the plaintiffs could have been exposed. Dr. Frosolono, in his turn, using Dr. Sklarew's scenario, and relying in addition on the literature and his own research, declared that such an exposure as evidently happened in this case, would have not even required treatment, much less caused injury.
In his charges to the jury in the present case the presiding judge explained that what the jury had to decide was whether or not each plaintiff had proved by a preponderance of the evidence that he was injured by the phosgene gas and, if so, the extent of those injuries. As we explained at the beginning of this opinion, the jury's responses to the interrogatories indicated that it found that the plaintiffs did not sustain any actual damage as a result of the exposure to phosgene. We regard this response, in each of the three cases, as a finding of fact. The standard of appellate review as to a finding of fact continues to be as described in the language of Canter v. Koehring Co., 283 So. 2d 716, 728 (La. 1973):
"When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellant (or appellate) court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts."
Appellants argue that the jury found that they were exposed to phosgene, and that therefore the refusal of the jury to find at least some damages was clearly wrong. They cite Labauve v. Central Mutual Insurance Co., 491 So. 2d 146 (La. App. 3rd Cir.1986), and Moss v. Security National Insurance Co., 350 So.2d 247 (La.App. 3rd Cir.1977), writ den. 352 So.2d 239 (La.1977). In Labauve, the jury awarded medical expenses but no general damages, which was clearly wrong. In Moss, this court found that an aggravation of a pre-existing condition was so apparent that the jury was clearly wrong in awarding no damages. Those two cases are not applicable here. The very issue before us is whether the plaintiffs suffered any damages at all as a result of the exposure. The evidence shows that it is not a fact that exposure necessarily causes damages. The jury found no damages. This finding of fact is not clearly wrong. We liken this case to Sonnier v. U.S. Casualty Co., 246 La. 401, 165 So.2d 3 (La.1964), where the Supreme Court held that, although in this state we do not subscribe to the common law doctrine of de minimis non curat lex, nevertheless, some injury has to be proved *1380 before an award of even nominal damages can be made. In this case the jury found that no injury was proved, and we are required to uphold that finding in the absence of clear error.
We move next to the remaining nine assignments of error. These are, for the most part, complaints of trial judge error in excluding or admitting evidence.

2.

The Death of Francisco Rodriguez
Francisco Rodriguez died from the phosgene. The plaintiffs wanted the jury to know that. Olin got an order in limine forbidding such mention, first in the opening statement and later in the testimony. These rulings are assigned as error. Plaintiffs urge that the evidence was relevant to show the reasonableness of their fear and mental anguish resulting from their exposure. They argue it was also relevant to show how toxic phosgene is, and to show the quantity of the release.
The trial judge based his ruling on information that the deceased was very close to the point of the release, just a few feet, while the plaintiffs were almost half a mile away. The rulings of the trial court were not an abuse of discretion. Considering the relative distances, the probative value of the evidence that one person died was outweighed by the dangers inherent in its admission. State v. Ludwig, 423 So.2d 1073 (La.1982); State v. Wheeler, 416 So.2d 78 (La.1982).

3.

What Happened at Bhopal, India
The trial court also would not allow one of plaintiff's experts to testify as to what happened at Bhopal where many people were killed by a lethal exposure to a gas. The trial judge was made aware that this was a different gas released under different circumstances and from a different height. This ruling was not an abuse of discretion for the same reason as given in the above assignment of error.

4.

The Deposition Testimony of Dr. Jacobus
Dr. Jacobus gave his testimony by video-deposition. He was asked on redirect to read into the deposition some excerpts from two scientific publications. He was not asked whether he had ever read the publications before or if he agreed with their contents. Although he recognized the publications as authoritative, and so stated, he was not asked if he agreed with what he was reading; he was merely asked to read what was pointed out to him to read. This was improper and the trial court properly excluded these readings from the testimony that went to the jury.

5.

Dr. Frosolono as an Expert on the Effects of Phosgene on Human Tissue
As mentioned earlier in this opinion, this doctor, who holds a Ph.D. in biochemistry, was qualified as an expert in pulmonary biochemistry. Dr. Frosolono spent six years as a pulmonary biochemist doing lung research at Mount Sinai Hospital, and he also spent six years on the faculty at Albert Einstein College of Medicine, where he taught medical students and conducted research in pulmonary biochemistry, pulmonary physiology, and pulmonary cell biology.
This expert's videotaped testimony was shown to the jury. In it he explained the physiological effects of phosgene on human tissue. The plaintiffs objected on the ground that some of his testimony consisted of medical opinion, and that he was not a medical doctor. The trial court overruled the objection. We have examined the testimony and the ruling was proper. Sciences often overlap. The expertise of Dr. Frosolono, though it perhaps overlapped medical science in some ways, was nevertheless his own expertise. The ruling was not an abuse of the broad discretion accorded the trial judge in his determination as to whether expert testimony should be held admissible and who should or should not be permitted to testify as an expert.

6.

Evidence of Fear of Cancer
Fontenot objected to what he describes in brief as the trial court's ruling forbidding *1381 evidence regarding fear of cancer. Actually, we do not find in the record where the trial court made any such ruling. There was an early colloquy between court and counsel in which a number of motions in limine were discussed, before the first witness was sworn. Among the subjects discussed was mention of Fontenot's intention to introduce fear of cancer as an item of damage. Although the matter was discussed, no specific ruling was made at the time, and the subject was thereafter never brought up again.

7.

The Intervention
Plaintiff Fontenot filed a motion to dismiss the workers compensation and medical payments intervention of Aetna Casualty and Surety Company, and the motion was denied. This ruling is asserted as error.
In his motion to dismiss, Fontenot declared that Olin had purchased the intervention from Aetna and that, having assumed the position of intervenor itself, the intervention is extinguished, presumably by confusion.
The trial judge never ruled on the motion. After a discussion, the trial judge said, "We'll hold off on the intervention aspect ... we'll hold off on it." Counsel for plaintiff then responded, "It'll be a question of jury instruction and argument and something else down the road." The trial court said, "We're a couple days away from that." The subject never arose again. At the conclusion of the trial all the parties stipulated that Aetna Casualty and Surety Company paid certain benefits to all three plaintiffs. This stipulation was read to the jury. Also, the instructions contained the following language:
"If you decide to render any award for any plaintiff, the award will be reduced by the amount of workmen's compensation paid to the plaintiff. You are instructed not to reduce an award if any. The court will make the reduction."
When asked at the conclusion of the reading of the charges whether counsel had any objections, counsel for plaintiff announced that plaintiffs had none. Accordingly, we do not reach the legal issue, if any, posed by this assignment of error because, in our opinion, the stipulation and consent to the jury instructions constituted an abandonment of the motion to dismiss the intervention.

8.

The Interrogatory as to Actual Damage
On each verdict sheet interrogatory No. 2 asked "Did (plaintiff) sustain actual damage..." Appellants complain that the word actual was misleading and should have been left out of both the interrogatories and the court's instruction regarding the interrogatories. The argument that the use of this word somehow caused the jury to overlook and therefore not award certain elements of damages is not a convincing argument. We need not dwell on this assignment, however, because immediately after the charges were read, the interrogatories explained, and the jury retired to deliberate, counsel were asked if they objected to the charges and counsel for plaintiffs indicated that there were no objections. A party may not assign as error the giving or the failure to give an instruction unless he objects thereto either before the jury retires to consider its verdict or immediately after the jury retires, stating specifically the matter to which he objects and the grounds of his objection. La. C.C.P. art. 1793(C).

9.

Closing Arguments
In Olin's closing arguments its counsel told the jury that if they answered the first interrogatory no, or the first interrogatory yes and the second one no, everybody could go home. It is urged that this was error because in effect the argument encouraged the jury to avoid its responsibility and take the easy way out.
We find no merit to this argument.

10.

Olin's Prior Inconsistent Statements About Insurance Coverage
Finally, plaintiffs complain that it was error not to allow them to impeach the *1382 credibility of defendants with prior inconsistent statements. They propounded interrogatories to Olin relative to insurance coverage. Olin first responded by claiming that it was self-insured, then discovered and made known the incompleteness of the answer by declaring that it had certain excess coverage. There was a stipulation regarding this coverage. Plaintiffs argue that they should have been allowed to put the allegedly inconsistent position of Olin on this question before the jury, as it was an issue of credibility.
We agree with the trial court that this evidence was inadmissible because it was collateral and irrelevant to any issue the jury had to decide. State v. Cappo, 345 So.2d 443 (La.1977). Insurance coverage was stipulated. Getting that information to the jury would have given them nothing to help them in deciding the issues in the case, and might have been unduly prejudicial to the defendants.
For the foregoing reasons, the judgment of the trial court is affirmed at the costs of appellant, Darrell Wall.
AFFIRMED.