533 So.2d 1365 (1988)
Dwight A. MARTIN and Gail M. Martin, Plaintiffs-Appellants,
v.
The HERTZ CORPORATION, et al, Defendants-Appellees.
No. 87-929.
Court of Appeal of Louisiana, Third Circuit.
November 9, 1988.
Writ Denied January 6, 1989.
*1366 Richard R. Kennedy, Lafayette, for plaintiffs-appellants.
John K. Hill, David Rabalais, Roy & Hattan, Candice Hattan, Lane Roy, Lafayette, for defendants-appellees.
Before GUIDRY, STOKER and KING, JJ.
GUIDRY, Judge.
Plaintiffs, Dwight A. and Gail M. Martin, filed suit against the Hertz Corporation, a self-insured entity; Ing. Otto Schad, the driver of a Hertz rental car; and, several insurance companies.[1] Plaintiffs sought damages for personal injuries and property damage they allegedly sustained as a result of an automobile accident which occurred August 12, 1984, near the intersection of Southwest Evangeline Thruway and Jefferson Street in Lafayette, Louisiana. The case was tried to a jury which returned a verdict finding defendant Schad 55% at fault and plaintiff, Dwight Martin, 45% at fault. The jury awarded plaintiffs $3,311.24 in special damages but made no general damage award.
On November 13, 1986, judgment was rendered and signed in accordance with the jury verdict and subsequently a timely motion for judgment notwithstanding the verdict and additur or, alternatively, for a new trial was filed by plaintiffs. The motions were heard by the district court. For reasons set forth in a minute entry, the trial court reversed the jury's finding of fault on the part of plaintiff, Dwight Martin; affirmed the jury's award of special damages; and, found the jury's failure to award general damages contrary to the law and evidence. Accordingly, an additur of $500.00 was ordered or, if the defendants refused to agree to the additur, a new trial. Defendants agreed to the additur and a judgment in accordance with the minute entry was rendered and signed on March 13, 1987.
Plaintiffs appeal from the latter judgment raising the following issues:
1. Did the trial court's failure to enforce its pre-trial order, by allowing the defense to refer to documents which were undisclosed during discovery, unduly prejudice plaintiffs' case and result in an unfair trial?
2. Did the trial court commit manifest error in ordering an additur of only $500.00 in the general damage award and in failing to raise the special damages awarded to include all stipulated past medical expenses, some amount for estimated future medical expenses and an amount for lost wages?
3. Did both the jury and the trial judge err in failing to make an award to Mrs. Martin for loss of consortium?
Defendants did not appeal nor answer the appeal.
The accident which gave rise to this suit was very minor. It occurred when defendant, Schad, changed lanes while traveling south on Southwest Evangeline Thruway causing the left side of his vehicle to contact the right front of the Martin vehicle. Testimony at trial established that, at the time of impact, the Schad vehicle was traveling at approximately five m.p.h. and the Martin vehicle was traveling between 15 and 18 m.p.h. According to plaintiff, he was wearing his seat belt and shoulder harness and when the collision occurred, his left shoulder struck the driver's door and he sustained a whiplash.
The accident occurred on a Sunday. Plaintiff sought no immediate medical attention and returned to work as a brakeman/switchman for Southern Pacific Transportation Company the next day. Martin was released from work early because he complained of having some difficulty with and pain in his left shoulder. The next day he saw Dr. Milton Jolivette, who, upon examination, found left side cervical muscle spasm plus tenderness and decreased motion of the left acromio-clavicular joint. Dr. Jolivette prescribed analgesics. When the patient returned two days later, relating that his shoulder pain was only partially relieved by the medication, *1367 Dr. Jolivette referred him to Dr. Robert Morrow, an orthopedic surgeon, who became his primary care physician.
Dr. Morrow first examined Martin on August 16, 1984, and continued to treat him through the date of trial. Dr. Morrow's initial examination revealed that the patient had some ecchymosis (bruising) over the anterior aspect of the left shoulder and the acromial-clavicular (A-C) joint; no significant paravertebral muscle spasm of the cervical musculature; and, limited range of motion of his neck and left shoulder. No dislocation of the A-C joint was revealed by x-rays. During the exam, Martin complained of tenderness over the A-C joint, pain when he flexed his humerus; tenderness in the lower cervical area (about C-5 thru C-7); and, tenderness of the left sternocleidoid muscle.
By mid-October, some two months post accident, most, if not all, of Martin's objective symptoms had disappeared. In a letter to Martin's counsel, Dr. Morrow described his findings as a result of his examination of plaintiff on October 4, 1984:
"... the patient seemed to be doing somewhat better with increasing range of motion of his neck and decrease in muscular discomfort although he says that he has some discomfort in the neck. Examination at that time revealed that the patient had full range of motion of the neck; there was no paravertebral muscle spasm or tenderness, and there was no spasm of the trapezius muscle. The patient had some slight swelling and tenderness over the dorsal aspect of the lateral acromium of the left shoulder. The AC joint did not seem to have any significant pain. At that time, I asked the patient to remove the neck collar and begin doing more range of motion exercises. I also had him continue physical therapy on a two times a week basis for the following two weeks, and I gave him some office samples of Rufen and had him take this on a 4 times a week basis until he returned."
That same letter also recounted Martin's October 18, 1984 visit and examination:
"... I saw the patient once again, and he had been attending physical therapy on a twice a week basis. At that time he was not wearing his neck collar. He said that he continued to have some discomfort on the left side of his neck in the trapezius muscle extending out to and including the left superior dorsal shoulder region. Examination at that time revealed that he had good range of motion of the neck[:] flexion ..., extension ..., lateral bending ... to each side and lateral rotation to ... each side. Resisted range of motion in these 6 phases was not significantly discomforting. He had no paravertebral spasm. There was no spasm of the trapezius muscle. He complained of slight tenderness over the left AC joint and dorsal acromium. He had full range of motion of the gleno-humeral joint on the left side in flexion, abduction, extension, internal and external rotation and adduction. The resisted muscle strength in these 6 phases were + 5/ + 5 bilaterally without any significant discomfort. He did complain of some discomfort at full flexiona nd [sic] full abduction of the left arm. Review of the x-rays revealed that he did not have any significant amount of distraction at the AC joint, with and without weights."
Dwight's continued complaints of pain, without discernable objective symptoms, caused Dr. Morrow to refer Martin to various other specialists for diagnostic tests. Dr. Thomas Laborde, a rehabilitation specialist performed a thermogram, a myelogram, and nerve conduction studies, all of which yielded normal results. Dr. Robert D. Martinez, a neurologist, did a bone scan which was also interpreted as normal.
Contemporaneously, plaintiff-appellant began complaining of ringing and diminished hearing in his left ear and left side facial and jaw pain. In response to these complaints, appellant was referred to an ear, eye, nose and throat specialist (E.E.N. & T.) and to two dentists, an oral and maxillofacial surgeon and an orthodonist.
At first the E.E.N. & T. specialist opined that Martin's loss of hearing stemmed from the August 1984 accident. The doctor later *1368 recanted this opinion when evidence was produced at trial establishing that plaintiff had a hearing loss dating back to early childhood. Upon production of these early records, plaintiff dropped his demands in this area.
Neither dentist was able to identify any specific pathologic or abnormal condition which was accident related. Both an examination of plaintiff's temporomandibular jaw joint and a panorex x-ray were negative. Both dentists noted that appellant had bruxing and clenching habits as well as several missing teeth. His dental hygiene was considered generally poor. Each agreed that bruxing, clenching, missing teeth and poor dental hygiene would predispose one to the problems (jaw, neck and head pain) of which plaintiff complained.
Dr. Glenn M. Kidder, a dentist who examined Martin at defendants' request, testified "... I don't think this accident had a lot to do with his [plaintiff's] symptoms". Dr. Kidder was of the opinion that plaintiff's bruxing and clenching were a more likely cause of any problems which he might have. Dr. Kidder related that, on three separate occasions during examination, he asked appellant to point to where his jaw pain originated. In response, Martin pointed to three different spots, none near his TMJ joint.
Based upon the negative results of Martin's many tests and his continued complaints of otherwise unexplained pain, plaintiff's doctors and dentists came to the conclusion that he must be suffering from myofascial pain syndrome. This condition, which many doctors doubt exists, is allegedly caused when the fascia (connective tissue) covering a muscle is injured and becomes inflamed. This inflamation allegedly produces pain and as the injured tissue heals, scar tissue is formed which impedes the normal movement of the muscle and also produces pain. The medical experts agreed that there are no objective symptoms or signs nor are there any tests which a doctor can perform in order to diagnose myofascial pain syndrome. Presence or absence of the condition is based solely on the subjective symptoms of the patient and his history as he relates it to the physician. Accordingly, the patient's honesty and credibility are paramount in making a diagnosis of myofascial pain syndrome.
In essence, plaintiffs' demands for personal injury damages rested, in most part, upon whether the jury and the judge believed that Dwight Martin was and had been suffering from myofascial pain syndrome. The jury's verdict and the trial judge's ruling on plaintiffs' motion for a judgment notwithstanding the verdict indicates that the triers of fact placed little or no credence in the history and complaints of pain related by plaintiff. Each apparently determined that Dwight Martin's complaints were ill-founded or not accident related. Thus, the principal issue for decision on appeal is whether these conclusions reached by the trial court are manifestly in error.
Plaintiff claims that he was "ambushed" during trial when defense counsel referred, in cross-examination of some of plaintiffs' witnesses, to certain documents not listed on defendants' pretrial list of exhibits and not provided to plaintiffs' counsel prior to trial. These documents covered two areas: (1) medical records showing plaintiff had a hearing loss from early childhood; and, (2) documents showing a subsequent accident in which plaintiff, Dwight Martin, was involved and a settlement with an insurance company for property damage and personal injury. Plaintiffs' counsel argues that, as a result of this tactic, he was surprised; had he been provided the contested material in advance, he would have structured the preparation and presentation of his case differently; and, substantial injustice resulted from the court's allowing the defense to use the heretofore undiscovered material.
We do not condone any knowing or deliberate failure of defense counsel to disclose this material to plaintiffs' counsel pursuant to the trial court's pre-trial order. However, for the reasons which follow, we discern no prejudicial error in the trial court's allowance of this evidence. Additionally, we do not find that plaintiff suffered substantial injustice as a result of this ruling.
*1369 In Gilcrease v. Gilcrease, 438 So.2d 658 (La.App. 2d Cir.1983), writ denied, 442 So. 2d 461 (La.1983), our brethren of the Second Circuit, with whom we agree, stated:
"La.C.C.P. Art. 1551 outlines pre-trial conference procedure in Louisiana. The theory inherent in pre-trial procedure is to avoid surprise and to allow orderly disposition of the case. The pre-trial order, or as in this case the pre-trial agreement, controls the subsequent course of the action but can be modified at trial to prevent substantial injustice. La.C.C.P. Art. 1551; Austrum v. City of Baton Rouge, 282 So.2d 434 (La.1973).
While we recognize that in such matters, the trial court is vested with discretion [Naylor v. La. Department of Public Highways, 423 So.2d 674 (La.App. 1st Cir.1982); Lawless v. Employers Mutual Fire Insurance Co., 263 So.2d 79 (La. App. 1st Cir.1972)], that discretion is necessarily controlled by the principle that it must be exercised to prevent substantial injustice to the parties who have relied on the pre-trial rulings or agreements and structured the preparation and presentation of their cases accordingly...."
We have no doubt but that plaintiffs' counsel was surprised and would have indeed structured the preparation and presentation of his case differently had he known defendants were in possession of the disputed evidence. However, we do not find that substantial injustice resulted from its use or that, under the circumstances of the instant case, the trial court erred in admitting this evidence.
In Recherche, Inc. v. Jewelry Jungle, Inc., 377 So.2d 1329 (La.App. 1st Cir.1979), writ denied, 379 So.2d 254 (La.1980), our brethren of the First Circuit addressed a similar situation stating:
"Jewelry Jungle argues that admission of exhibits not listed on the pre-trial order was improper. We disagree.
The unlisted exhibits admitted over Jewelry Jungle's objections included:
1. the sales brochure and form contract of Recherche;
2. a confidential memorandum;
3. copies of an agreement, check request and check;
4. Jewelry Jungle's bead sales records for December 1977.
Jewelry Jungle had actual knowledge of the existence of most of the documents admitted over its objections. Further, none of the documents were of a type defendant would not expect to be used in a case of this nature. Ulmer v. Baton Rouge General Hospital, 361 So. 2d 1238 (La.App. 1st Cir.1978). Defendant also had the opportunity to rebut the evidence, Lefort v. Meibaum Bros., Inc., 321 So.2d 824 (La.App. 4th Cir.1975), but apparently was unable to do so successfully...."
The circumstances of this case are strikingly similar. While plaintiffs' attorney may not have had knowledge of this evidence, plaintiffs most certainly did and apparently decided not to disclose this damaging evidence to their own counsel, presumably in the hope that it would go undiscovered. To exclude this evidence, under the circumstances, would have resulted in substantial injustice to the defendants. Further, as in Recherche, supra, plaintiffs were allowed the opportunity to rebut this evidence but their efforts were apparently without success.
The record is replete with inconsistencies in Dwight Martin's testimony: why he left previous jobs and when; why he terminated his schooling at U.S.L.; on which side of his face he had jaw pain; and, when that pain commenced, to name a few. Of course, the many inconsistencies in Martin's testimony reflected upon his credibility and supports the jury's apparent disbelief of his complaints of personal injury.
As noted at the outset of this opinion, the judgment N.O.V. granted by the trial judge amended the jury's determination in only two respects, i.e., to assign 100% of accident fault to the defendants and to award general damages in the amount of $500.00. Neither party questions the judgment N.O. V. insofar as it allocates fault. However, appellant does question the special damage award made by the jury and the quantum award made by the trial judge in ordering an additur.
*1370 In granting judgment N.O.V. and additur, the learned trial judge stated:
"The jury awarded special damages in the amount of THREE THOUSAND THREE HUNDRED ELEVEN AND 24/100 ($3,311.24) DOLLARS, but failed to award any sum for general damages. The parties stipulated that the plaintiff's property damage came to TWO THOUSAND SIX HUNDRED ELEVEN AND 24/100 ($2,611.24) DOLLARS. Therefore, it must be assumed that the jury awarded the remaining SEVEN HUNDRED AND NO/100 ($700.00) DOLLARS for medical expenses
. . . . .
Considering the importance of the plaintiff's credibility in evaluating the medical testimony it was reasonable for the jury to conclude that many of the medical bills incurred were unnecessary and/or unrelated to the accident complained of. Therefore, the Court will not disturb the award of SEVEN HUNDRED AND NO/100 ($700.00) DOLLARS for medical expenses.
Although an award was made for medical expenses, none was made for general damages. This failure to make an award for general damages was contrary to the law and the evidence. Labauve v. Central Mutual Insurance Co., et al., 491 So.2d 146 (La.App. 3d Cir. 1986). Therefore, the plaintiff's motion for a new trial as to general damages only will be granted unless the defendant enters an additur of FIVE HUNDRED AND NO/100 ($500.00) DOLLARS within forty-five days from the date of signing of the judgment."
The judgment N.O.V., insofar as it amends the jury's verdict so as to award general damages, is clearly correct. In Labauve v. Central Mutual Insurance Company, et al, 491 So.2d 146 (La.App. 3rd Cir.1986), we stated:
"... Our courts have recognized that a jury cannot award special damages for personal injuries incurred in an accident and refuse to award any amount in general damages for injuries that present objective symptoms. See Evans v. Newton, 459 So.2d 586 (La.App. 5th Cir.1984); Curry On Behalf of Curry v. Allstate Ins. Co., 435 So.2d 1030 (La.App. 4th Cir.1983); Odendahl v. Wild, 418 So.2d 36 (La.App. 4th Cir.1982); Griffin v. Bethard, 398 So.2d 639 (La.App. 3rd Cir. 1981); Brown v. Grigsby, 394 So.2d 847 (La.App. 3rd Cir.1981); Moss v. Security National Insurance Co., 350 So.2d 247 (La.App. 3rd Cir.1977), writ denied, 352 So.2d 239 (La.1977); Robinson v. General Motors Corporation, 328 So.2d 751 (La.App. 4th Cir.1976)."
It is obvious from the verdict and the judgment N.O.V. that the jury and the trial judge concluded that, as a result of the accident, the plaintiff, Dwight A. Martin, suffered very minimal injuries which were resolved within a very short period of time. Presumably, for this same reason, the jury and the trial judge rejected Mrs. Martin's claim for loss of consortium. After carefully reviewing the record, we are unable to discern any manifest or clear error in these conclusions. With regard to the trial judge's award of general damages, suffice it to say that, although low, the award does not constitute a clear abuse of the trial court's great discretion, i.e., lower than the lowest award reasonably within the trial court's discretion.
Accordingly, for the reasons stated above, the judgment of the trial court is affirmed. Costs of this appeal are taxed to the appellants.
AFFIRMED.
NOTES
[1] American Southern Insurance Company, plaintiffs' UM carrier, was the only insurer-defendant at the time of trial, all others having been dismissed.