551 So.2d 774 (1989)
Douglas DAY and Brenda Day
v.
SOUTH LINE EQUIPMENT COMPANY; Trans-American Transportation Company; Richard Perry; and the ABC, DEF and XYZ Insurance Companies.
No. 88 CA 1001.
Court of Appeal of Louisiana, First Circuit.
October 11, 1989.
Writ Denied December 8, 1989.
*776 Jerry L. Hermann, Houma, for plaintiffs and appellees, Douglas Day and Brenda Day.
Jan P. Jumonville, New Orleans, for defendants and appellants, Trans-American Transp. Co. and Indus. Indem. Co. of Northwest.
Before CARTER, SAVOIE and ALFORD, JJ.
CARTER, Judge.
This is a suit for damages for personal injuries.

FACTS
In August, 1985, Gary Haines of Milchem, Inc. (Milchem) contacted William Loving of Southline Equipment Company (Southline) regarding the sale of several used forklifts. At the time, some of the forklifts were located in Houma, and some forklifts were in the process of being moved to Houma for repair. On or about August 30, 1985, Loving travelled to Houma *777 to inspect and appraise the forklifts, noting the physical condition and operability of each forklift. Thereafter, on September 1, 1985, Southline purchased seven of these forklifts from Milchem. Under the terms of the agreement, Southline purchased the forklifts FOB Houma.
Loving then made arrangements for transporting the equipment from Houma to Southline's offices in Houston, Texas. Loving contacted Trans-American Transportation Company (Trans-American Transport) and spoke with Clyde Reid regarding the transportation arrangements. Loving informed Reid of the number and location of the units and the approximate weight of each unit. Thereafter, Reid contacted Richard Perry to perform the transportation services on behalf of Trans-American Transport or Trans-American Brokerage Company (Trans-American Brokerage).
On September 6, 1985, Perry arrived at the Milchem facility in a high-level, flatbed tractor-trailer. The Milchem facility was not equipped with loading docks, and Perry had not brought any equipment to aid in loading the forklifts. Plaintiff Douglas Day and his helper Michael Duet, employees of Milchem, assisted Perry in loading the seven forklifts.
In the loading operation, Day and Duet used two Milchem shop forklifts to lift the Southline forklifts into the air. While the Southline forklift was suspended in the air, Perry would back his flatbed between the two shop forklifts and beneath the suspended forklift. When the backing maneuver was completed, the suspended forklift was lowered onto the flatbed.
Because two of the Southline forklifts were large and inoperable, they had to be loaded first. These two large forklifts were placed behind one another on the flatbed because they were too wide to be placed side by side. Additionally, they had to be placed near the front of the flatbed for proper weight distribution. The remaining forklifts were to be placed as shown in the following diagram:

The third forklift was then placed on the flatbed, behind the second forklift, and pushed to one side. The fourth forklift, which had a functioning engine and appeared to be operable, was loaded behind the third forklift. Day then mounted the fourth forklift, while it sat on the flatbed, and attempted to maneuver it beside the third forklift. As Day pushed the foot pedal into forward gear, the forklift lurched backwards. As Day applied the brakes, the brake line broke, and the brake pedal went to the floorboard. The forklift then rolled off the back of the flatbed, crushing Day's right leg and breaking his nose. After Day was taken to the hospital, Duet and Perry loaded the remaining forklifts.
On January 28, 1986, plaintiffs, Douglas and Brenda Day, filed suit for damages against Southline, Trans-American Transport, Richard Perry, and their insurers.[1] Southline and Trans-American Transport answered plaintiffs' petition, denying the allegations contained therein and pleading Day's contributory negligence. Southline subsequently amended its answer, asserting a third party demand against Milchem.[2]
On October 17, 1986, plaintiffs amended their petition to specifically name the insurers of Southline and Trans-American Transport. Named as insurer of Southline was Commercial Insurance Company of *778 Newark, New Jersey (Commercial); Industrial Indemnity Company of the Northwest (Industrial) was named as the insurer of Trans-American Transport. Industrial answered plaintiffs' petition, denying the allegations and asserting Day's contributory negligence. Plaintiffs later amended their petition, naming Trans-American Brokerage as an additional defendant. Day's employer, Milchem, and its worker's compensation insurer, Aetna Casualty and Surety Company (Aetna), filed a petition of intervention, seeking reimbursement of worker's compensation and medical benefits paid.[3] Southline subsequently filed a third party demand against Forklift Services, Inc. (Forklift Services), the alleged purchaser of the forklift which caused Day's injuries.[4]
The matter proceeded to a jury trial. During the presentation of plaintiffs' case, the Days and Southline and Commercial entered into a compromise agreement, settling all claims between them.[5] After the trial, the trial court determined that Southline was 60% at fault and Trans-American Transport was 40% at fault in causing Day's injuries. The trial court also determined that Day was not contributorily negligent.[6] In assessing the damages sustained *779 by the Days, the jury awarded damages as follows:

A. Past, present and future medical
 expenses including home modifications,
 if any........................................$ 200,000.00
B. Past, present and future physical
 and mental pain and suffering.................$ 500,000.00
C. Permanent disability, disfigurement
 and scarring..................................$1,000,000.00
D. Past loss of earnings..........................$ 87,000.00
E. Future loss of earnings and
 earning capacity..............................$ 400,000.00
 ____________
 TOTAL......$2,187,000.00
 ==============

Accordingly, judgment was rendered against Trans-American Transport and Industrial for $874,800.00.
From this adverse judgment, Trans-American Transport and Industrial appeal, assigning the following errors:
1) The jury erred in finding Transamerican Transportation 40% negligent for the injuries of Douglas Day.
2) The Honorable trial judge erred in admitting plaintiffs' hearsay evidence and then refusing to admit defendant's rebuttal evidence.
3) The jury erred in not finding the plaintiff/appellee Douglas Day contributorily negligent.
4) The Honorable trial judge erred in admitting photographs of a gruesome nature which had a prejudicial effect upon the jury that far outweighed their probative value.
5) The jury erred in awarding the plaintiff damages for disfigurement and scarring of $1 million, for pain and suffering of $500,000, and $200,000 in medical damages and home modifications which were excessive and constituted an abuse of the jury's "much discretion".
Plaintiffs answered the appeal, urging that the trial court erred in failing to find that Perry was an agent of Trans-American Transport and was at fault in causing Day's injuries.[7]

EVIDENTIARY RULINGS
Trans-American Transport contends that the trial court erred in admitting into evidence Exhibits P-13 (a letter from the Washington Secretary of State) and in refusing to admit into evidence Trans-American Brokerage's proffers 1, 2, 3, and 4 (documents identifying Trans-American Brokerage as per Department of Licensing, State of Washington). Trans-American Transport further contends that the trial court erred in admitting certain allegedly gruesome photographs.
Hearsay Evidence
Trans-American Transport contends that plaintiffs' evidence, an uncertified, unsigned letter from the Washington Secretary of State, constituted hearsay and was therefore inadmissible. Trans-American Transport also contends that the trial court erred in refusing to admit certain evidence to rebut plaintiffs' evidence.
At trial, plaintiffs introduced into evidence an uncertified, unsigned letter from the Washington Secretary of State, Corporations Division, which stated that the corporations division had no record of Trans-American Brokerage as a corporation in that state. Trans-American Transport objected to the exhibit on the grounds that the evidence was inadmissible hearsay. The trial court overruled the objection because local rules of court required that objections be filed three days before the trial and Trans-American had not timely filed its objection.
In Gilcrease v. Gilcrease, 438 So.2d 658 (La.App. 2nd Cir.1983), writ denied, 442 So.2d 461 (La.1983), our brethren of the Second Circuit, with whom we agree, stated:
La.C.C.P. Art. 1551 outlines pre-trial conference procedure in Louisiana. The theory inherent in pre-trial procedure is to avoid surprise and to allow orderly disposition of the case. The pre-trial order, or as in this case the pre-trial agreement, controls the subsequent course of *780 the action but can be modified at trial to prevent substantial injustice. La.C.C.P. Art. 1551; Austrum v. City of Baton Rouge, 282 So.2d 434 (La.1973).
While we recognize that in such matters, the trial court is vested with discretion [Naylor v. La. Department of Public Highways, 423 So.2d 674 (La.App. 1st Cir.1982); Lawless v. Employers Mutual Fire Insurance Co., 263 So.2d 79 (La. App. 1st Cir.1972)], that discretion is necessarily controlled by the principle that it must be exercised to prevent substantial injustice to the parties who have relied on the pre-trial rulings or agreements and structured the preparation and presentation of their cases accordingly. (Footnote omitted) [438 So.2d at 662-663.]
In the instant case, counsel for Trans-American Transport, although denying that she received a copy of the exhibit, acknowledged that she was informed about the exhibit at the conference prior to trial. In refusing to sustain Trans-American Transport's objection, the trial court noted that plaintiffs' counsel could have cured the objection had he been informed of the objection prior to trial. We do not find that substantial injustice resulted from its use or that the trial court erred in admitting this evidence. The local rules of court are intended to aid the orderly conduct of litigation and are not to be construed so literally as to defeat their intended purpose. Ulmer v. Baton Rouge General Hospital, 361 So.2d 1238 (La.App. 1st Cir.1978); Caston v. Woman's Hospital Foundation, Inc., 243 So.2d 872 (La.App. 1st Cir.1971). See also Martin v. Hertz Corporation, 533 So.2d 1365 (La.App. 3rd Cir.1988), writ denied, 535 So.2d 746 (La.1989); Recherche, Inc. v. Jewelry Jungle, Inc., 377 So.2d 1329 (La.App. 1st Cir.1979), writ denied, 379 So.2d 254 (La.1980).
In an attempt to rebut plaintiffs' evidence regarding the lack of corporate status of Trans-American Brokerage, Trans-American Transport sought to introduce four exhibits purporting to establish that Trans-American Brokerage was a trade name of another Washington corporation
and that Trans-American Brokerage was a licensee of the Interstate Commerce Commission. Although the trial judge permitted Chris Thompson, president of Trans-American Brokerage, to testify regarding these matters, the trial judge refused to permit the documentary evidence. The trial judge refused to admit the documents into evidence because they were not listed in the pre-trial statement.
As noted above, the pre-trial order controls the subsequent course of action, but can be modified to prevent substantial injustice. Trans-American Transport based its trial defense on the fact that Trans-American Brokerage contracted with Southline. Its failure to place into the pre-trial order the documentary evidence necessary to corroborate the testimony of its witnesses should not be excused at plaintiffs' expense. Plaintiffs were not aware of Trans-American Transport's documentary evidence until after they rested their case. To permit the introduction of this evidence, under the circumstances, would have resulted in substantial injustice to the plaintiffs. Additionally, Trans-American Transport was able to elicit testimony from one of its witnesses regarding the substance of the documentary evidence. We cannot say that the trial court abused its discretion in refusing to admit the proffered evidence.
Gruesome Photographs
Trans-American Transport further contends that the trial court erred in admitting photographic evidence, which was of an allegedly gruesome nature. Trans-American Transport reasons that any probative value these photographs had was outweighed by their prejudicial effect.
In Lanclos v. Hartford Accident & Indemnity Company, 366 So.2d 621 (La.App. 3rd Cir.1978), the court noted that the test for the admissibility of allegedly gruesome photographs is whether their probative value outweighed any inflammatory effect. See State v. Kent, 489 So.2d 1354 (La.App. 1st Cir.1986); State v. Lively, 457 So.2d 1236 (La.App. 1st Cir.1984).
*781 In the instant case, the photographic evidence objected to by Trans-American Transport depicted Day's physical injuries at various stages of his recuperation. One photograph depicted the physical condition of Day's foot after the initial amputation. The photograph showed Day's foot after his toes had been removed. A second set of photographs illustrated the plates and rods which had been inserted into Day's leg and the open wounds which Day endured during the healing process. A third set of photographs illustrated Day's stump from various angles once the healing process was substantially completed.
We have viewed the photographs, and, while they may be unpleasant, we do not find them gruesome or inflammatory. The trial judge determined that their probative value outweighed any inflammatory effect. We find no error in this finding.

TRANS-AMERICAN TRANSPORT'S FAULT
Trans-American Transport contends that the jury erred in finding that Trans-American Transport was 40% at fault in causing Day's injuries. Trans-American Transport reasons that Trans-American Brokerage, and not Trans-American Transport, was the party who contracted with Southline for the transportation of the forklifts. Trans-American Transport further reasons that, as such, it cannot be liable for plaintiffs' damages.
In the instant case, the record is replete with evidence, although conflicting, regarding which party (Trans-American Transport or Trans-American Brokerage) contracted with Southline for the transportation of the forklifts from Houma to Houston.
The truck driver, Richard Perry, testified that Clyde Reid, dispatcher and agent for Trans-American Transport, contacted him to haul the seven forklifts from Houma to Houston. Perry indicated he had dealt with Reid and Trans-American Transport for four to five years.
William Loving of Southline testified that, once he arranged for the purchase of the forklifts from Milchem, he contacted Trans-American Transport for the transportation of the equipment to Houston. Loving testified that he spoke with Clyde Reid at Trans-American Transport.
Clyde Reid testified that, when he began working, he was employed by both Trans-American Transport and Trans-American Brokerage. In September of 1985, however, Reid testified that he was employed only by Trans-American Brokerage. Reid acknowledged that Chris Thompson was his supervisor for both companies and was the president of both companies. Additionally, the same clerical help was employed by both companies.
Furthermore, although the bill for services was sent to Southline by Trans-American Brokerage, the driver information/dispatch sheet prepared at the time of the contract was completed on a Trans-American Transport form. Reid explained that this document was an internal company document only and had been prepared on behalf of Trans-American Brokerage on excess forms of Trans-American Transport. Reid denied that the contract for transportation was between Milchem and Trans-American Transport.
Additionally, in answers to interrogatories propounded to Trans-American Transport, Trans-American Transport acknowledged that there was an oral agreement between Southline and Trans-American Transport to pick up and deliver the forklifts. These answers were later repudiated as being prepared in error.
When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable basis for the trial court's factual finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Petersen v. State Farm Automobile Insurance Company, 543 So.2d 109 (La.App. 3rd Cir.1989).
After carefully reviewing the record, we find that the jury's evaluations of credibility are reasonable and that the evidence furnishes a reasonable basis for finding that Trans-American Transport *782 was the party with whom Southline contracted to provide transportation services.
Having determined that Trans-American Transport, and not Trans-American Brokerage, was the party who provided the transportation services in the instant case, we must determine whether Trans-American Transport was negligent.
Wiley G. Poole, an expert in engineering, safety, and accident analysis, testified on behalf of the Days. Poole determined that seven forklifts would have overloaded the flatbed truck sent by Trans-American Transport. Further, Poole testified that Trans-American Transport sent the improper equipment for the safe loading of the forklifts. A lowboy or trailer with a drop tailgate or a truck with a winch was necessary to haul the heavy equipment safely. Poole also opined that the duty to load the equipment was on the transport carrier.
Dennis R. Howard, a general safety expert, testified that attempting to haul seven forklifts on only one vehicle contributed to the accident. Given that the Trans-American Transport vehicle exceeded the gross permitted weight by approximately 2,000 lbs., Trans-American Transport should have contracted for the services of more than one vehicle. Howard also testified that the type of trailer dispatched by Trans-American Transport was not reasonable from a safety standpoint.
Fred Liebkmann, an expert in mechanical engineering with knowledge of safety design and forklifts, testified on behalf of Trans-American Transport. Liebkmann testified that it was unnecessary to use a lowboy to transport the forklifts and that the use of the flatbed was proper under the circumstances. Liebkmann also testified that the use of a winch to load the forklifts was unnecessary and that the use of a forklift to load a flatbed was proper. However, Liebkmann admitted that the use of a crane or winch to load the forklifts onto the flatbed would have been safer. Additionally, Liebkmann opined that the excess weight of the forklift for the flatbed did not cause the accident.
The testimony adduced at trial supports the conclusion that Trans-American Transport had a duty to provide the proper vehicle to transport the used forklifts and/or to provide adequate equipment to assist loading the forklifts on the type of vehicle sent. The jury determined that Trans-American Transport was at fault in sending only one trailer and/or sending a high-level trailer without equipment to assist in the safe loading of the forklifts and that the accident was caused, in part, by this failure.
We have reviewed the record under the appropriate standard, and we cannot say that the jury was manifestly erroneous in finding that Trans-American Transport was at fault in causing plaintiffs' damages.

DAY'S FAULT
Trans-American Transport contends that the jury erred in not finding that Day was negligent in causing his own injuries. Trans-American Transport reasons that Day's conduct fell below the standard to which he should have conformed for his own safety and, as a result, he was comparatively negligent.
Contributory negligence is defined as plaintiff's conduct which falls below the standard of care to which he should perform for his own protection. Bridgewater v. State Department of Corrections, 434 So.2d 383 (La.1983); Hano v. Louisiana Dept. of Transportation and Development, 519 So.2d 796 (La.App. 1st Cir.1987), writ denied, 523 So.2d 861 (La.1988). By Acts 1979, No. 431, § 1, effective August 1, 1980, Louisiana adopted a pure comparative negligence system, which was specifically designed to ameliorate the harshness of the contributory negligence doctrine by apportioning losses between the plaintiff and defendant when both are negligent. Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967 (La.1985). LSA-C.C. art. 2323 provides as follows:
When contributory negligence is applicable to a claim for damages, its effect shall be as follows: If a person suffers injury, death or loss as the result partly of his own negligence and partly as a *783 result of the fault of another person or persons, the claim for damages shall not thereby be defeated, but the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death or loss.
A defendant who claims contributory negligence as an affirmative defense must prove by a preponderance of the evidence that the injured party failed to act as a reasonable and prudent person and that his negligence was a legal cause of the accident. Tucker v. Lirette, 400 So.2d 647 (La.1981); Rawls v. Morris, 470 So.2d 531 (La.App. 1st Cir.1985). Contributory negligence is never presumed; such negligence on the part of the plaintiff must be proved as any other fact by a preponderance of the evidence. Bridgewater v. State Department of Corrections, supra; Tirante v. Gulf States Utilities Company, 412 So.2d 128 (La.App. 1st Cir.1982), writ denied, 414 So.2d 389 (La.1982).
The threshold inquiry in determining legal cause is whether the act was a substantial factor in causing the accident. Breithaupt v. Sellers, 390 So.2d 870 (La. 1980). For the most part, a determination of contributory negligence is a factual matter lying within the discretion of the trial court, and such determination will not be disturbed on appeal in the absence of manifest error. Petersen v. State Farm Automobile Insurance Company, supra; Marshall v. Biggs, 392 So.2d 111 (La.App. 1st Cir.1980), writ denied, 394 So.2d 1244 (La. 1980).
Dennis Howard testified that, as a safety expert, he would have tested the brakes on the forklift because the forklifts were brought to the Milchem facility for repair and had been exposed to the elements for several months. However, Howard opined that Day had reason to believe that the brakes were operable because the forklift had been driven from the fence to the area near the flatbed earlier without difficulty. After considering all of the options available to Day on the date of the accident, Howard testified that Day did the best with what he had.
Wiley Poole testified that he would not have attempted to load the forklifts onto the flatbed in the manner in which Day did, but acknowledged that he was a safety engineer and would not necessarily hold others to that standard.
Richard Perry testified that he witnessed the entire loading operation and did not observe Day do anything wrong in loading the forklifts onto the flatbed.
Fred Liebkmann testified that it was improper for Day to attempt to drive the forklift while atop the flatbed. Liebkmann felt that because the forklift was present at the Milchem facility for repairs of unspecified problems, Day should not have attempted to drive the forklift without testing its operability.
The jury heard the testimony of each of these witnesses and determined that Day was not negligent. After reviewing the entire record under the appropriate standard, we cannot say that the jury's determination was manifestly erroneous.

APPORTIONMENT OF FAULT
In determining percentages of fault, the trier of fact must consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed. Chandler v. Jones, 532 So.2d 402 (La.App. 3rd Cir.1988); Mergen v. Piper Aircraft Corp., 524 So.2d 1348 (La.App. 1st Cir.1988), writs denied, 532 So.2d 154, 155, 156 (La.1988). Factors to be considered in determining percentages of fault are: whether the conduct resulted from inadvertence or involved unawareness of the danger; how great a risk was created by the danger; significance of what was sought by the conduct; capacities of the actors, whether superior or inferior; and any extenuating circumstances which might have required the actor to proceed in haste, without proper thought. Watson v. State Farm Fire and Casualty Insurance Co., supra; Mergen v. Piper Aircraft Corporation, supra; Ladner v. Firemen's Insurance Company of Newark, 519 So.2d *784 1198 (La.App. 2nd Cir.1988). See also Chandler v. Jones, supra.
In Turner v. New Orleans Public Service, Inc., 476 So.2d 800 (La.1985), the court added another guideline which we think pertinent here, "[t]he greater the risk of harm to others, the greater is the fault." Bernard v. Casualty Reciprocal Exchange, 534 So.2d 1348 (La.App. 5th Cir. 1988), writ denied, 536 So.2d 1241 (La. 1989). Assessments of fault will be reviewed under the well-established standard that the findings of fact of the trial court are not to be disturbed unless they are clearly erroneous. Franklin v. Oilfield Heavy Haulers, 478 So.2d 549 (La.App. 3rd Cir.1985), writs denied, 481 So.2d 1330, 1331 (La.1986).
Having determined that Trans-American Transport contracted to supply transportation services, we must determine whether the jury erred in assessing Trans-American Transport with 40% of the fault in causing plaintiffs' damages.
In the instant case, the conduct for which Southline was held liable arose out of its ownership of the defective forklift which contributed to the accident. Trans-American Transport's fault involved the breach of its duty to provide adequate and safe transportation services. The jury, upon hearing the testimony and observing the demeanor of the witnesses, apportioned 40% of the fault to Trans-American Transport. After reviewing the record and taking into consideration the factors enunciated in Watson v. State Farm Fire and Casualty Insurance Co., supra, we find that the jury's determination is not clearly wrong.

QUANTUM
Trans-American Transport contends that the jury erred in its damage award. Specifically, Trans-American Transport contends that the $1 million award for permanent disability, disfigurement, and scarring and the $500,000.00 award for past, present, and future physical and mental pain and suffering were excessive and an abuse of the jury's much discretion.
In reviewing damage awards, an appellate court may disturb an award made by the trial court when the record reflects that the trier of fact abused its discretion in making the award. Emerson v. Empire Fire and Marine Insurance Company, 393 So.2d 691 (La.1981). There is no mechanical rule for determining general damages and the facts and circumstances of each case must control. An appellate court cannot alter the judgment of the trier of fact unless first being able to articulate, from the record, that the trier of fact has abused its much discretion. Reck v. Stevens, 373 So.2d 498 (La.1979); French Jordan, Inc. v. Oilfield Sales and Services, Inc., 439 So.2d 523 (La.App. 1st Cir.1983). If an appellate court determines from the record that the trier of fact has abused its much discretion, then the court may only reduce a general damage award to the highest level a reasonable trier of fact could have awarded. Reck v. Stevens, supra; Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976).
In the instant case, the evidence demonstrates that at the time of the accident, Douglas Day was thirty-nine years old. Day had graduated from high school, served in the U.S. Navy, and served a tour of duty in Vietnam where he was thrice wounded in action. Day had been employed at Milchem for over sixteen years when he was injured in the accident.
Day described how the accident happened, the process by which he was extricated from beneath the forklift, and the pre-hospital treatment of his leg. Day testified that he was hospitalized for forty-five days during which time he underwent two amputations and eleven surgeries on his leg. He also received treatment for a broken nose, which had to be rebroken to properly heal. Day testified that, since the date of the accident, he had had twelve different prostheses, each bringing fitting and healing problems.
In adjusting to the various prosthetic devices, Day had fallen numerous times. Day is unable to stand for any amount of time because of pain in his leg and suffers back pain because of the unevenness of his *785 legs. Day testified that his family life has also been affected. His children have been in fights at school because of cruel remarks that their father is a "peg-legger." Day's personal relationship with his wife was also affected in that their sexual relationship became limited after the accident.
Brenda Day testified that she and Day lived together for several years and were married three days after the accident. Brenda stated that she and Day had always planned on marrying, but had not set a date. When the accident occurred, Brenda testified that "he had enough to worry about [other] than me walking off leaving him and the kids and I wanted to assure him that no matter what that I still loved him and ... that I loved him and no matter what I'd stand by him, with one leg or two."
The Days had seven children. Prior to the accident, Day would play football and baseball, wrestle with the children, jump on the trampoline, walk through the woods, swim and fish, and ride in the boat. He was also helpful around the house, assisting Brenda with caring for the children, helping with homework, cooking supper and cleaning up afterwards, and helping with the grocery shopping.
Brenda testified that, after the accident, Day went through many adjustments. He used a wheelchair when they initially returned from the hospital, but later began using a walker or crutches. The crutches made his underarms raw, but Day persisted. He lost his balance several times, falling in the living room and at Sunday School. On a family outing, Day attempted to swim with the children, but encountered difficulties in getting back into the boat. After Day maneuvered himself out of the water and on the top of the boat, he had to throw his body and flop into the boat "like a dead fish."
The Day's seven children have also been adversely affected by the repercussions of the accident. Day is not able to accompany the children to school activities, and Day's injuries are a source of embarrassment to one of the seven-year-olds. Day is unable to carry the newest member of the Day family, five-week-old Douglas Edward Day, Jr., and must have the baby brought to him so that he can care for his son.
Day's twelve-year-old son, Ray, testified that his father was very active before the accident, but that he cannot do many of those activities now. Ray testified that he misses his father's company. Ray also testified as to the fights he has been involved in at school. The fights are usually caused by cruel remarks about his father's physical condition, which makes Ray angry.
Shirley Green, plaintiffs' friend and neighbor, testified that she had occasion to observe Day's physical activities both before and after the accident. Green testified that, prior to the accident, Day was very active, playing with his own children and with the neighborhood children. Day regularly jumped on the trampoline, played ball, rode three-wheelers, bar-b-qued for friends, dressed in costume for children, and generally entertained the children. Day was also a good neighbor, assisting her when she needed help with her car or was afraid.
Green testified that, after the accident, Day attempted to do the same things for the children, but was unable to perform any of the activities he had prior to the accident. Day attempted to play ball, but could not run. He no longer had the endurance or the patience. Green also noticed a marked change in the Day children. One of the children, in particular, pulled back when Day attempted to hug his son.
The pain Day suffered was obvious to Green, and he encountered problems with his prosthesis. Green testified that Day underwent several surgeries and experienced disappointment each time. Green also testified that Day had fallen trying to adapt to using his artificial limb. The first prosthesis irritated Day's stump, which caused it to become raw and bleed.
Dr. William H. Kinnard, an orthopedic surgeon, testified that he first began treating Day on September 6, 1985, when Day had been involved in an accident. Dr. Kinnard noted that, when he evaluated Day in the emergency room, Day's right leg was severely injured. There was a severe fracture *786 with extensive involvement of the ligaments surrounding the knee and a severe, crushing injury to the foot. The x-rays revealed that the bones in the forepart of the foot were broken and displaced. The foot was lacerated in three places, which exposed the nerves and blood vessels. Additionally, Dr. Kinnard saw no evidence of normal muscles, and the exposed tendons were stretched and frayed. Day's toes were blue and discolored, indicating to Dr. Kinnard that they would not survive. The heel bone of the foot was exposed and had been pushed to the inside of the foot.
Dr. Kinnard's initial surgery revealed injuries so severe that he was pessimistic about the chances of survival of the foot. After realigning the bones and placing pins in the foot, Dr. Kinnard decided not to spend an excessive amount of time repairing the foot because he did not believe it would survive. Dr. Kinnard then concentrated his efforts to the significant injury to the lower thigh, knee, and shin. Dr. Kinnard observed two major fragments in the femur and another major fragment in the tibia. A large cut from the center of the front of the leg to the back of the leg severed the shin to the bone, cutting through all the ligaments on the inner aspect of the knee, all of the joint capsule, all of the cartilage, and the cartilage's attachment to the joint. The hamstring muscles and calf muscles were also torn. Dr. Kinnard placed pins to hold the bone fragments together, noting that portions of the bone were missing. Dr. Kinnard also inserted a plate into the leg. The major nerves and blood vessels in the area were significantly injured.
Subsequent to the initial surgery, Day returned to Dr. Kinnard's office to have the wound cleaned and flushed with sterile water and antibiotics to prevent infection. On September 8, 1985, Dr. Kinnard amputated Day's foot at the transmetatarsal area just beyond the mid foot. Dr. Kinnard at that time also performed other surgical procedures to clean the wounds. On September 16, 1985, after consultation with four other surgeons, Dr. Kinnard amputated Day's right leg through the knee. Dr. Kinnard acknowledged that it would have been quicker and easier to amputate Day's leg at a higher level. If the amputation had been performed above the knee, a sufficient amount of skin, which was clean and in good condition, would have remained, making it easier to close the wounds. However, the higher the amputation, the more energy required and the more difficulty involved in using an artificial leg. Although there was a large area of skin loss on the inner aspect of the leg, Dr. Kinnard opined that skin grafts would enable him to provide Day with a good stump for an artificial leg. Dr. Kinnard then performed some five additional surgical procedures to close the amputated leg. Dr. Kinnard applied split thickness skin grafts, which permitted the development of a functional stump.
Dr. Kinnard also testified regarding the problems amputees encounter with reference to pain. Aside from the significant amount of pain associated with a traumatic, crushing injury, amputations involve a lot of pain. Cutting through the nerves that run into the area which has been removed causes the nerves to repeatedly attempt to grow back. Often neuromas develop, which occurred with Day. A small ball or tumor developed in the nerve tissue of the stump, which was extremely tender and excitable. Day also faced the future development of neuromas. Dr. Kinnard also acknowledged that amputees often experience "phantom limb" pain for which there is no good treatment.
Dr. Kinnard also testified that amputees often experience increased back pain because of the use of a prosthesis. The abnormal gait of an amputee disrupts his normal coordination. This places additional stress on the healthy leg and spine, which often results in arthritic problems. Dr. Kinnard testified that Day's activities would be restricted because of his physical condition, including climbing, squatting, stooping, and kneeling. Day has and will continue to have difficulty walking for any prolonged length of time. Day will not be able to stand or walk for more than one hour. Additionally, Day is unable to lift more than thirty to fifty pounds because of *787 the additional stress on his energy level. Dr. Kinnard also testified that, as Day ages, it is more probable that Day will find the use of a wheelchair less demanding and more convenient than the use of his prosthesis. As he ages, Day's energy level will decrease, and it will be more difficult for him to use the prosthesis.
Dr. Kinnard performed three additional surgical procedures for revision of the stump, the last of which was performed on April 15, 1987. Dr. Kinnard continues to periodically check Day's progress and regularly monitors the problems with the stump and prosthesis. Dr. Kinnard also testified that Day may have to undergo additional surgical procedures in the future.
Dr. Anthony Herques, an ENT, first examined Day on September 7, 1985, for a nasal fracture. Dr. Herques performed an open reduction of the nasal fracture with correction of the inside on September 24, 1985. This procedure involved opening the nose from the inside, removing the twisted bone from the middle part of the nose, and replacing the bones in the proper position.
Dr. Herques classified the nasal surgery as a success, but noted that patients often develop sinus problems because of the initial trauma and that surgery alters the physiology of the nose. Dr. Herques testified, however, that he last examined Day in October of 1985 at which time Day did not complain of sinus problems.
Jerome Voisin, who is certified in orthotics and prosthetics, testified that he first examined Day on November 5, 1985, when Voisin casted Day for the first prosthesis. Voisin noted that the stump was in the process of healing, so Day was fitted for a "bucket" prosthesis, which would lace onto Day's stump and adjust for shrinkage.
Voisin testified regarding some of the problems Day encountered with his initial prosthesis. The skin on the distal end of Day's stump adhered to the bone. This caused difficulties with his prosthesis because the skin needs to the flexible, which required time. Each subsequent prosthesis likewise involved adjustments.
In describing the effect of the use of a prosthetic device, Voisin noted that a prosthesis is a tool. It does not generate energy like a normal leg. If an amputee takes sixty steps a minute, a normal person takes ninety steps. The artificial limb weighs eight to ten pounds, so lifting the artificial leg sixty times a minute consumes more oxygen and requires more energy.
Trans-American Transport did not present any testimony or documentary evidence to refute the Days' evidence as to damages. Trans-American Transport simply relied on its cross-examination of the Days' witnesses and evidence to defeat the Days' claim for damages.
The jury awarded Day $500,000.00 for physical and mental pain and suffering. Considering the extent and duration of Day's injury, with emphasis on the hours of unrelieved pain prior to the initial surgery, the weeks of pain between the initial surgery and subsequent amputations, the endurance of numerous skin grafts to repair the stump and the resulting complications from difficulties with the prosthetic devices over an extended period of time, and the future problems Day will endure, we cannot say that the jury's award of $500,000.00 for past, present, and future physical and mental pain and suffering is an abuse of discretion.
In assessing damages for permanent disability, disfigurement, and scarring, the jury awarded Day $1,000,000.00. The evidence, both through the testimony of the witnesses and photographic evidence, demonstrated the disfigurement and scarring as well as the permanent disability Day suffered. Encompassed in an award for loss of earning capacity is the permanent disability sustained by the injured party. In the instant case, Day was awarded $400,000.00 for future loss of earnings and earning capacity. Also, disfigurement and scarring have as an integral part of their substance the mental pain and anguish that accompany such disfigurement and scarring. Day was awarded $500,000.00 for physical and mental pain and suffering. Although this court recognizes that Day has suffered and will continue to suffer substantial physical and mental pain and *788 has sustained permanent disability and severe scarring and disfigurement, Day has been partially compensated for some of these damages in the damage awards for future loss of earnings and earning capacity and physical and mental pain and suffering. Therefore, we find that the $1,000,000.00 award for permanent disability, disfigurement, and scarring is excessive. After consideration of the evidence and past awards as reflected in the jurisprudence, we believe that $625,000.00 is the highest award for permanent disability, disfigurement, and scarring which was reasonably within the discretion of the jury. Accordingly, the award for permanent disability, disfigurement, and scarring is reduced from $1,000,000.00 to $625,000.00.
Trans-American Transport further contends that the jury's award of $200,000.00 for past, present and future medical expenses, including home modifications was excessive.
Jerome Voisin, the prosthetics expert, testified that the Veteran's Administration recommends replacement of the prosthesis every three years and that each prosthetic device costs approximately $4,500.00. Voisin testified that from the date of the accident to the date of trial, Day had incurred $13,053.41 in expenses for prostheses.
Dr. Kinnard testified that Day incurred past medical expenses with the Houma Orthopedic Clinic of $18,410.00 and that Day could expect additional medical expenses in the future. Additionally, Exhibit P-26 revealed an additional $69,326.80 in past medical expenses, bringing total past medical expenses to $87,686.80.
Merlin Lirette was accepted by the court as an expert in architecture with knowledge and experience in architecture rehabilitation. Lirette testified that he inspected and reviewed Day's current residence to determine the feasibility of modifying the residence to make it handicap accessible. Lirette testified that several modifications were required. First, a ramp for entry had to be constructed. The hallway and doorways also needed to be widened. Additionally, the two existing bathrooms in the Day home had to be widened, and handicap fixtures had to be installed. The size of the master bedroom had to be increased to allow for unconfined movement around the bed. The size of the walk-in closet in the bedroom also had to be increased to permit Day access to his clothing. The kitchen and utility room needed to be widened, and the wall of the garage needed to be relocated. The kitchen cabinets also needed to be replaced or modified to permit Day access to them. Lirette estimated that it would cost between $20,000.00 and $35,000.00 to make these modifications.
Lirette, however, was of the opinion that the suggested modifications should not be made to the Days' existing residence. Lirette estimated that the Days' home would appraise for $40,000.00 to $45,000.00, and he could not justify $35,000.00 of modifications to a $40,000.00 home. Lirette estimated that a new home which was constructed to accommodate handicapped individuals would cost $112,500.00.
After carefully reviewing the evidence presented by the Days, which was not rebutted by Trans-American Transport, we find that the jury's award of $200,000.00 for past, present, and future medical expenses, including home modifications, is reasonably supported by credible evidence in the record.

CONCLUSION
For the above reasons, the judgment of the trial court is amended to reduce the award for permanent disability, disfigurement, and scarring from $1,000,000.00 to $625,000.00, thereby reducing the total amount of the judgment in favor of Day and against Trans-American Transport and Industrial from $874,800.00 to $724,800.00. In all other respects, the trial court judgment is affirmed. Trans-American Transport and Industrial are cast for all costs.
AMENDED AND AFFIRMED.
SAVOIE, J., agrees in part and dissents in part, and will assign reasons.
*789 SAVOIE, Judge, dissenting.
From the affirmation of the award of $500,000.00 for mental pain and suffering and physical pain and anguish and from the insufficient reduction of the award of $1,000,000.00 for disability, disfigurement and scarring to $625,000.00 I respectfully dissent. As to all other results reached by the majority I concur.
The award for mental pain and suffering and physical pain and anguish is $500,000.00. I find it to be high. Would this have been the end of the award by the jury for general damages I would not disturb same; however, when it is accompanied by an award of $1,000,000.00 for permanent disability, disfigurement and scarring, I find the two together to be far in excess of what should have been awarded. They do in fact shock my conscience and warrant serious reduction.
There are serious problems in attempting to differentiate the award for disability, disfigurement, and scarring from the awards for future physical and mental pain and suffering, and future loss of earnings and earnings capacity. Disfigurement and scarring have as an integral part of their substance the mental pain and anguish that come from such disfigurement and scarring. This has already been awarded in the sum of $500,000.00. The award for permanent disability in this case is in sum and substance an award for loss of earning capacity. In Black's Law Dictionary 415 (5th ed. 1979), disability is always defined with reference to work related inabilities. Therefore, what we have here is a second award for mental pain and suffering, and a second award for loss of earning capacity,[1] a duplication of awards. Disfigurement remains as the only basis for the $1,000,000.00 award. I consider a substantial award for plaintiff's disfigurement to be $125,000.00. Under the circumstances that exist here I do not think anything greater is warranted.
The majority also found part of the general damages award to be excessive and reduced same by $375,000.00; however, we are not favored with its reasoning for the amount of the reduction or the amount of the award.
I have examined awards for loss of a leg from throughout this state and I have listed them on an attached exhibit "A". The highest award for loss of a leg is $625,000.00. This was given to a high school boy for an above-the-knee amputation.
Considering the above and foregoing, and the attached exhibit "A", I would reduce the $1,500,000.00 award for general damages to the sum of $625,000.00. Such an award would bring the majority opinion into compliance with the supreme court's mandate in Reck v. Stevens, 373 So.2d 498 (La.1979).

EXHIBIT A

Voncannon (3rd '75) $105,000.00 gen'l damages
306/437 - 47 yr old woman lost rt. leg
 above knee, Broke left leg
 jaw, face, pelvis
Green (3rd '75) $50,000.00 P & S
309/706 14 yr old boy
 left leg above kneemalpractice
Wilkinson (3rd '75) $124,285.31 Total
311/584 - woman
 rt. leg above knee $100,000.00 was gen'l
 broke both thighs, left ankle
 lacerationsauto accident
Curry (1st '81) $520,000.00 Total
405/1387 - equipment operator $120,000.00 P & S
 rt. leg below knee

*790
 broke right arm, internal injuries
 - auto accident
Cullivan (3rd '83) $500,000.00 gen'l damages
428/1231 - 63 yr. old man
 lost both legs,
 multiple rib fractures
 terrible cardiac prognosis
Picou (4th '86) 27 yr. old college student- Increased by $100,000.00
488/1230 left leg below knee, to total of $383,000.00
 additional surgery gen'l damages $240,341.00
 on rt. knee, traction,
 lost 50 lbs.
Gresham (2nd '88) 14 yr old $250,000.00 gen'l damages
524/48 left leg below knee
 broken rt leg, pubic
 bone
 dislocated pelvicinjured rt. knee
Breshers (3rd '88) 13 yr. old boy $200,000.00 gen'l damages
536/733 rt leg below knee
 lost 1/3 tissue mass in
 left leg
Byrd (2nd '89) high school boy ct. appeals sets awards
543/35 above knee amputation $325,000.00 Past P & S
 Future $300,000.00
Allen (2nd '88) 39 yr old woodcutter $225,000.00 gen'l damages
535/903 leg 6 inch stump
Finley (2nd '85) 20 yr old girl $250,000.00 gen'l damages
476/837 rt leg below knee
 punctured bladder
Blacks 5th Ed.Disability refers to work related disability.

NOTES
[1] In their original petition, the Days did not specifically name each insurer, but referred to Southline's insurer as ABC Insurance Company, Trans-American Transport's insurer as DEF Insurance Company, and Perry's insurer as XYZ Insurance Company.
[2] Milchem filed exceptions to Southline's third party demand, pleading various objections including no cause of action, no right of action, immunity in worker's compensation, prescription, ambiguity, and nonconformity with LSA-C.C.P. art. 891. By judgment, dated September 9, 1987, the trial court determined that Milchem, as Day's employer, was immune from tort liability and dismissed Southline's third party demand against Milchem.
[3] Although the record does not contain a copy of the petition of intervention filed by Milchem and Aetna, the record contains plaintiffs' answer to the intervention. Additionally, by judgment, dated March 10, 1988, plaintiffs compromised their claims against Milchem and Aetna.
[4] Forklift Services filed a declinatory exception pleading the objection of lack of jurisdiction over the person. By judgment, dated September 9, 1987, the trial court granted Forklift Services' exception and dismissed Southline's third party demand against Forklift Services.
[5] By joint motion and order of partial dismissal, dated December 30, 1987, plaintiffs dismissed Southline and Commercial.
[6] The verdict form reveals the findings of the jury as follows:......

1) Was the accident caused by the negligence of any of the following defendants, that is, was the conduct of the defendant below the standard of care owed to Douglas Day, and thus, at fault and a legal cause of the damages suffered by the plaintiff?
 a) Richard Perry: Yes ____ No &check;
 b) Southline Equipment
 Company: Yes &check; No ____
 c) c-1 Trans-American
 Transportation
 Company Yes &check; No ____
 or
 c-2 Trans-American
 Brokerage Yes &check; No ____
Note: As to defendant (c), you should only
 answer as to c-1 or c-2, not both.
Go to question 2.
2) Was the accident caused by the strict liability of Southline Equipment Company, that is, (a) was the forklift in the care, custody and control of Southline Equipment Company,
(b) was the forklift defective in that it posed a condition creating an unreasonable risk of harm, and (c) did the forklift cause the injury complained of?
 Yes &check; No ____
If the answer to Question 1 and 2 are no, your deliberation is over and you can return to the Courtroom. If the answer to any part of question 1 or 2 is yes, go to question 3.
3) Was Douglas Day's conduct below the standard of care under the circumstances for his own safety, that is, did Douglas Day contribute through his own fault to his injury?
 Yes ____ No &check;
Go to question 4.
4) Although not named as a defendant and not a party to this suit, was the accident caused by the strict liability of Milchem, Inc., that is: (a) was the forklift in the care, custody and control of Milchem, Inc., and (b) was the forklift defective in that it posed a condition creating an unreasonable risk of harm, and (c) did the forklift cause the injury complained of?
 Yes _____ No &check;
Go to question 5.
5) Was Richard Perry a statutory employee of Trans-American Transportation?
 Yes ____ No &check;
Go to question 6.
6) What was the degree of fault, if any, of Southline Equipment Company, Trans-American Transportation, Richard Perry, Milchem, Inc., or Douglas Day expressed in a percentage?

a) Richard Perry (0-100%): 0%
b) Southline Equipment Company
 (0-100%): 60%
c-1) Trans-American Transportation
 (0-100%): 40%
or
c-2) Trans-American Brokerage
 (0-100%): 0%
d) Milchem, Inc. (0-100%): 0%
e) Douglas Day (0-100%): 0%
 Total: 100%

Note: As to defendant (c), you should only answer as to c-1 or c-2, not both. The percentage should equal 100%.
[7] Although in their answer to the appeal plaintiffs alleged trial court error in its failure to find Perry, as an agent for Trans-American Transport, negligent, this error was not briefed on appeal. Pursuant to Rule 2-12.4, Uniform Rules, Court of Appeal, this error has been abandoned.
[1] The trial court awarded and the majority affirmed the award of $487,000.00 for past and future loss of earnings.